The MIAMI PIPE LINE COMPANY, Inc., a Corporation, Appellant,

v.

The PANHANDLE EASTERN PIPE LINE COMPANY, a Corporation, Appellee.

No. 9018.

United States Court of Appeals Tenth Circuit.

Oct. 6, 1967.

**22**

Robert R. Irwin, Topeka, Kan., for appellant.

William S. Richardson, Kansas City, Mo., (Byron M. Gray, Topeka, Kan., and Wendell J. Doggett, Kansas City, Mo., on the brief), for appellee.

Before PHILLIPS, LEWIS and HILL, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge.

On October 16, 1961, the Miami Pipe Line Company[1] commenced this action against the State Board of Social Welfare of Kansas[2] and Panhandle Eastern Pipe Line Company[3] in the District Court of Shawnee County, Kansas.

Miami is a Kansas corporation, with its principal office in Osawatomie County, Kansas. Panhandle is a Delaware corporation, with its principal office in Kansas City, Missouri. The Welfare Board is an official board of the State of Kansas.

Panhandle removed the action to the United States District Court for the Dis-

trict of Kansas. A motion of Miami to remand the case was denied.

The trial court dismissed the action against the Welfare Board without prejudice, on the ground that as to it the action was a suit against the State and the State had not consented to be sued.

The action then proceeded to trial against Panhandle before the court, without a jury, and resulted in a judgment in favor of Panhandle. Miami has appealed.

In its petition for removal, Panhandle averred that Miami's petition set up a separate and independent claim against it, which would be removable if sued upon alone, and joined it with one or more otherwise nonremovable claims or causes of action within the meaning of 28 U.S. C.A. § 1441(c); and that the Welfare Board was fraudulently joined as a party defendant for the sole purpose of preventing Panhandle from removing the case from the State court to the Federal court.

*Part I*

Miami contends that the trial court erred in not remanding the action to the State court. Hence, we must consider the pertinent allegations of Miami's petition in the State court.

In the first cause of action of its petition, Miami alleged:

That Panhandle owns and operates under certificates of public convenience and necessity issued by the Federal Power Commission an integrated gas pipeline system in the States of Texas, Oklahoma, Kansas, Missouri, Illinois, Indiana, Ohio and Michigan; that it produces natural gas from its leases located in Texas and Kansas, and purchases natural gas produced in Texas, Oklahoma and Kansas; that it transports and sells such gas in interstate commerce for resale for domestic, commercial and other uses and also directly to industries and others for their own use;

That "on or about January 6, 1953, the plaintiff (Miami) had a contract

1. Hereinafter called Miami.

2. Hereinafter called the Welfare Board.

3. Hereinafter called Panhandle.

with the defendant Panhandle for the purchase of natural gas to be transported through plaintiff's (Miami's) pipeline for resale to the defendant Board (the Welfare Board) for use at the Osawatomie State Hospital";

That "at the same time the plaintiff (Miami) had a contract with the defendant Board (Welfare Board) for the purchase of such gas";

That on or about such date "the defendants (Panhandle and the Welfare Board) entered into a plan or devise for the purpose of breaching their contracts with plaintiff (Miami)" and obtaining for Panhandle "the 6½¢ per M.C.F. rightfully due plaintiff (Miami)."

Miami undertook to set out the particulars of the plan or devise by the allegations in its petition hereinafter set out.

Miami alleged that for many years prior to October 1, 1943, it "had been supplying natural gas to the Osawatomie State Hospital from shallow gas wells in and about the * * * hospital grounds" and that "the last written contract was entered into on October 1, 1943." Miami attached to its petition as Exhibit A a copy of such contract.

The first paragraph of such contract read:

"This Contract made and entered into this 1st day of October, 1943 by and between the Miami Pipe Line Company, a Kansas Corporation, hereinafter called the vendor, and The State of Kansas, hereinafter called the vendee."

It recited that "The vendor * * * for the past several years" had been "furnishing to the vendee the greater part of its fuel requirements at the Osawatomie State Hospital" and that it was "the mutual desire of the parties" to the contract "that the facilities of the vendor * * * be enlarged and increased to meet the entire fuel requirements of" the State Hospital.

By its terms "the vendee" agreed "to purchase and accept delivery from the vendor the merchantable natural gas that said vendor" could "deliver toward the fuel demand of" the State Hospital; and "the vendor" agreed it would "use its best endeavors and abilities to supply enough of such natural gas to meet the entire fuel requirements of the" State Hospital; and "the parties * * * mutually" agreed "that the price of said gas" should be "twenty-one (21¢) cents per 1000 cubic feet" and that the contract should remain in force and effect for a period of one year from its date.

The closing paragraph of the contract read:

"In Witness Whereof, The parties hereto have set their hands and seals this date above first mentioned."

The contract was signed as follows:

"Attest:
Kenneth R. Johnson,
Secretary
Approved
David L. MacFarlan,
Chairman
State Board of Social Welfare

The Miami Pipe Line Company
By Emil J. Miller, President
Vendor
The State of Kansas
By (illegible)
Its Business Manager, Vendee"

———◆———

It is important to keep in mind that the parties to the contract of October 1, 1943, were Miami and the State of Kansas; that the recitals therein referred to Miami and the State and to no other parties; that the agreements and covenants in the contract were those of the State and Miami and no other persons, and that only Miami and the State by its Business Manager executed the contract;

that Miami asserted no claim of a breach of any contract by the Welfare Board other than the contract of October 1, 1943; that Miami's allegations referred to above that the gas to be purchased from Panhandle by Miami was for resale to the Welfare Board, and that the Welfare Board entered into a plan or devise with Panhandle for the purpose of breaching a contract of Miami's *with the Welfare Board* are clearly refuted by the contract of October 1, 1943, the contract to which the allegations referred, which shows that the Welfare Board was not a party to such contract, and that the gas purchased from Panhandle by Miami was not for resale to the Welfare Board, but to the State.[4] Moreover, as we shall later undertake to show, on October 1, 1943, the authority, jurisdiction and power to enter into contracts for the purchase of gas to be used for fuel and other purposes at the State Hospital were vested in the State Business Manager, under the direction of the State Department of Social Welfare, which succeeded to all the powers, jurisdiction and authority of the State Board of Social Welfare on April 15, 1939, with respect to the purchase of supplies, including natural gas, for the use of the State Hospital.

Miami further alleged:

That following the expiration of the one-year term of the contract of October 1, 1943, "the parties continued to operate under the terms of the contract and extended it by gas supplied, bills rendered, bills paid, efforts on the part of both parties to make a supply of gas available";

That by August 30, 1946, the amount of gas produced from the local wells adjacent to the State Hospital was falling off, and that on that date Miami entered into a contract with Panhandle, whereby the latter agreed to apply to the Federal Power Commission for a certificate of public convenience and necessity, authorizing it to install the necessary facilities and to sell to Miami gas, as provided for in the contract, "for resale to Osawatomie State Hospital", and upon the issuance of such certificate to construct and operate a metering and regulating station at a point on its pipeline in close proximity to Miami's transmission line; and whereby Miami agreed to construct and operate all necessary pipeline connections to the outlet side of Panhandle's meter, that such gas should be used solely at the Osawatomie State Hospital and that Miami would cooperate with Panhandle in securing such certificate; and whereby the parties thereto mutually agreed such contract should continue "for a term of one year commencing on the date of First delivery" thereunder "and from year to year thereafter unless terminated by either party upon not less than sixty (60) days notice prior to the termination of the then current term"; that Panhandle made application to the Federal Power Commission for such certificate and that Miami cooperated with Panhandle in its efforts to secure such certificate; that on October 11, 1946, the Federal Power Commission granted Panhandle temporary authorization to proceed with the construction and operation of the facilities and rendering service to Miami referred to in such contract, and that the certificate was granted on March 12, 1947;

That on December 4, 1950, Miami mailed a letter to the Business Manager of the State Hospital and sent copies to other various state agencies involved, which stated that the State Hospital was taking in excess of the base load; that such excess was costing Miami 1½¢ per M.C.F. more than the base load; and suggested the following future rate:

"For the first 425 M.C.F. per day 21¢ per M., as at present; for any and all gas delivered in excess of 425 M.

4. Indeed, the Welfare Board, party defendant here, was not in existence when the contract was entered into and the state welfare board then in existence was abolished in 1947, as we shall show more particularly hereinafter.

per day for the billing period, 22½¢ per M.C.F.";

that the letter concluded:

"If this proposal is agreeable to you, we will increase the volume of gas available to you up to the reasonable limits of our physical plant and the current rules and regulations of the Federal Power Commission";

and that "on December 12, 1950," Miami "received verbal assurance from" the Business Manager of the State Hospital "of the State's acquiescence in the new rate and * * * new billings as of December 17, 1950."

It will be noted that the letter stated that the State acquiesced in the new rates, again indicating that any contractual relationship was between Miami and the State and not between Miami and the State Hospital.

*Miami further alleged:*

That by July 3, 1951, the supply of gas from local wells had become exhausted, and in order to assure the State Hospital of an adequate supply of gas, Miami on that date entered into a new gas purchase contract with Panhandle, which superseded the agreement of August 30, 1946, and which provided that it would run for a definite term of 20 years, commencing October 1, 1951, and continue thereafter from year to year, unless and until cancelled by either party on 18 months written notice; that the maximum delivery obligation would be 1,950 M.C.F. per day, and that the service area would be "suburban and rural Miami County, Kansas, including especially and particularly the Osawatomie State Hospital";

That on January 6, 1953, Ed Burge, State Business Manager, mailed a letter to Miami reading as follows:

"The State of Kansas has determined that it may obtain natural gas at the Osawatomie State Hospital * * * at a rate less than that for which your company now furnishes such gas supply.

"Therefore, effective February 15, 1953, any and all arrangements or agreements expressed or implied by which your company has been furnishing gas to the Osawatomie State Hospital are hereby cancelled.

"If you care to negotiate with the state for the state's purchase of the pipeline through which you service this institution, we will be glad to discuss such matter with you within the next 10 days";

That on January 27, 1953, Ed Burge, the State Business Manager, wrote a letter to Miami which stated:

" * * * we have agreed to offer $4,500.00 for the pipe line that your company is now furnishing the hospital with gas through this line. Hoping that I may have a decision by February 3, 1953, I am";

and that on February 2, 1953, Miami wrote a letter to Burge in which it declined that offer;

That in the summer of 1953 "the defendant Board did cause a four inch pipeline to be constructed paralleling defendant's pipeline at a cost to the state of $8,400";

That on July 17, 1953, "the defendant Board entered into an industrial gas purchase contract with * * * Panhandle for the purchase of natural gas for use as fuel and other uses in the Osawatomie State Hospital"; that "the contract was for a period of two years and was to continue from year to year thereafter unless cancelled at the end of a subsequent year by giving sixty days written notice"; and that the price of the gas fixed by said contract was 31¢ per M.C.F.

An examination of the contract of July 17, 1953, Exhibit E to Miami's petition, discloses that the parties to the contract were Panhandle and the State of Kansas, and that neither the Welfare Board nor the State Department of Social Welfare were parties to such contract.

The last paragraph of the contract read:

"In Witness Whereof, the parties hereto have caused this agreement to

be signed by their respective officers thereunto duly authorized."

"Panhandle Eastern Pipe Line Company
By Leslie T. Fournier,
Vice-President
State of Kansas
By Eugene W. Hiatt,
Director of Purchases,
Department of Administration
By George W. Jackson, Md.
Director of Institutions, Department of Social Welfare
By Assistant Director,
A. E. (illegible)"

———◆———

The concluding paragraph of the first cause of action in Miami's petition, preceding the prayer, read:

"The plaintiff has, by the improper and illegal conduct of the defendants resulting in a continuing breach of their contracts with plaintiff suffered damages in the amount of $130,864.76 * * *."

On the same alleged facts, Miami, in a second cause of action, sought equitable relief by injunction restraining the carrying out of the contract of July 17, 1953, and interference with the contracts of October 1, 1943, and July 3, 1951.

We set forth in Appendix A to this opinion, in summary or by direct quotation, the pertinent Kansas statutes relative to the jurisdiction, duties, powers and authority of the Kansas state boards here concerned and of the State Business Manager with respect to the State Hospital. An examination of such Appendix will disclose the following statutory enactments:

Section 1 of the Act of May 26, 1917, Kan.L.1917, ch. 297, created a Board of Administration to manage the state institutions of Kansas.

Section 5 of such Act provided that said Board of Administration should constitute the Board of Trustees for the "educational, benevolent and penal institutions of the state" and should control and manage such institutions.

The signatures of the contract were as follows:

Section 2 of the Act of April 1, 1933, Kan.L.1933, ch. 271, provided that the Board of Administration should appoint and employ a Business Manager for the institutions covered by such Act, and that the Business Manager, under the Board of Administration, should have full authority to manage and control such institutions.

In 1933, the then applicable statute provided that the State Hospital should be under the control of the Board of Administration.

Section 3 of the Act of April 2, 1937, Kan.L.1937, ch. 327, created a State Board of Social Welfare, consisting of five members. Section 8 of such Act empowered such Board to make contracts in the name of "the state board of social welfare" and provided that "in such name" it could "sue and be sued on such contracts."

Section 1 of the Act of March 28, 1939, Kan.L.1939, ch. 202, created a State Department of Social Welfare, to consist of the State Board of Social Welfare provided for in § 2 of the Act and its agents and employees. Section 2 provided that there should be a State Board of Social Welfare, to consist of three members appointed by the Governor.

Section 7 of such Act provided that all jurisdiction, powers and duties then conferred by law relating to the State Hospital and other designated institutions

not here material "are hereby withdrawn from the state board of administration and conferred upon the state department of social welfare" and that "the powers and duties now or hereafter conferred by law upon the state business manager relating to the benevolent institutions herein named, shall be exercised by such business manager by and through said department of social welfare."

Section 5 of the Act of March 31, 1939, Kan.L.1939, ch. 285, amended § 74–108, Kan.G.S.Supp.1937, to provide that the State Business Manager "under the direction of the state board of regents, state department of social welfare or board of administration, as the case may be, shall purchase all the supplies required by the institutions under the management and control of each of said boards * * *."

■ Accordingly, we conclude that the power to purchase gas for the State Hospital on October 1, 1943, by virtue of the 1939 Acts referred to above, was vested in the State Business Manager under the direction of the State Department of Social Welfare; that such power was not to be exercised by the State Board of Social Welfare; and that contracts for the furnishing of such supplies were to be made in the name of the State and not in the name of the State Board of Social Welfare.

■ It seems to us that it incontrovertably appears from the allegations of Miami's petition, the exhibits attached thereto, and the applicable Kansas statutes that Miami could not recover a judgment against the Welfare Board for damages for breach of or causing the breach of the contract of October 1, 1943, made in the name of the State and not in the name of the Welfare Board. This we will show with more particularity in Part II of this opinion. Hence, we conclude that the sole purpose of Miami in joining the Welfare Board as a party was to prevent removal of the action to the Federal court, and that such joinder was fraudulent.

Moreover, we think it clear that Miami was attempting to assert an independent claim against Panhandle for damages for breach of the contract of July 3, 1951.

It follows that the denial of the motion to remand was proper.

### Part II

Miami also contends that the court erred in dismissing the action against the Welfare Board.

It will appear from an examination of Appendix A that the State Board of Social Welfare, provided for as a part of the State Department of Social Welfare created by the Act of March 28, 1939, Kan. L.1939, ch. 202, was abolished by the Act of June 30, 1947, Kan.L.1947, ch. 425, and a new Board of Social Welfare was created by the latter Act; and that the new State Board of Social Welfare created by such 1947 Act was abolished by the Act of March 22, 1949, Kan.L.1949, ch. 446, and a new Board of Social Welfare was created by the latter Act; and that the powers and duties of the State Board of Social Welfare were redefined by the Act of March 15, 1951, Kan.L.1951, ch. 288.

Thus it will be seen that the State Board of Social Welfare in existence when the contract of October 1, 1943, was entered into by the State of Kansas had been abolished and a new State Board of Social Welfare had been created and was in existence at the time Miami alleged there was a breach of such contract, namely, September 29, 1953, and at the time the petition was filed and the action commenced by Miami in the State court, namely, October 16, 1961. Hence, it is the latter State Board of Social Welfare that was a defendant to the instant action.

■ While the suit was brought against such Welfare Board, recovery was sought for breach of or causing the breach of the contract of October 1, 1943, made by the State of Kansas and not by the then existing State Board of Social Welfare, nor by the Welfare Board. Hence, if the action be viewed or considered one for breach of the contract of October 1, 1943, the breach was by the State, not by the Welfare Board, which

was not a party to the contract, and it was clearly a suit against the State. On the other hand, if the action be viewed or considered as one for damages against the Welfare Board for causing a breach of the contracts of October 1, 1943, and July 3, 1951, it still is a suit against the State of Kansas, to which the State has not consented, because the contract of October 1, 1943, was not made in the name of the Welfare Board or any preceding state welfare board, and the contract of July 3, 1951, was not made in the name of the Welfare Board, and Kansas has consented only to a suit against the Welfare Board on contracts made in its name.

We conclude, therefore, that the action against the Welfare Board was, in substance, an action against the State of Kansas, and that the court did not err in dismissing the action against the Welfare Board.

### Part III

A pretrial conference was had at which Miami admitted that Panhandle had delivered all gas requested by Miami under the service agreement of July 3, 1951; that Panhandle was still furnishing gas to Miami under such service agreement; that Miami was represented by counsel in a proceeding before the Kansas Corporation Commission, Docket No. 45, 164–U and that the opinion of the Commission, attached to Panhandle's answer as Exhibit B, was handed down in such proceeding.

In the opinion of the Kansas Corporation Commission just referred to, the Commission found that on April 3, 1953, it entered an order of its own motion to determine the needs and requirements of the State Hospital for natural gas and to consider the availability to such institution of sufficient volumes of Kansas-produced natural gas for its utilization, and at the same time ordered Miami and Panhandle to show cause at a hearing on April 21, 1953, which was continued until May 18, 1953, why a requisite and sufficient supply of natural gas from the Kansas Hugoton Gas Field should not

be continued to be made available to the State of Kansas for the State Hospital under fair and reasonable terms and conditions; and that at a public hearing held by the Commission both Miami and Panhandle appeared by counsel with respect to such matters.

It further found that Panhandle owns and operates an integrated natural gas pipeline system, extending from the gas producing areas in the Panhandle fields of Texas into and through portions of Oklahoma, Kansas, Missouri, Illinois, Indiana and Ohio, and terminating in Michigan; that Panhandle produces natural gas from extensive leasehold acreage in Texas, Oklahoma, and Kansas and transports it through its interstate pipeline facilities and sells it to utilities for resale and also directly to industries in several of such states;

That Miami and the State of Kansas had not had a contract for the purchase of gas since October 1, 1944, and that since such date the arrangement for the supplying of gas by Miami to the State Hospital had been unilateral on the part of Miami;

That Miami was realizing an excessive and unconscionable profit on the basis of the investment which it had; that Panhandle could supply gas produced from gas wells in the State of Kansas directly to the State Hospital; that the State of Kansas desired to negotiate with Panhandle for a contract for the delivery of such gas to the State Hospital; that Panhandle owed a duty to sell and supply such gas to the State for the State Hospital; and that the State should negotiate directly with Panhandle for the supply of such gas.

The Commission ordered that the memorandum opinion be incorporated and be made a part of Docket No. 45, 164–U.

At the trial, Miami, through its counsel, admitted that there was no scheme, plan or devise between Panhandle and any Kansas boards or state officials for the purpose of breaching the contracts between Miami and the State, dated October 1, 1943, and Panhandle and Miami,

dated July 3, 1951. The trial court so found on evidence that was free from substantial dispute.

Indeed, the only joint action alleged in the pleadings or shown by the proof between Panhandle and the State was the contract entered into on July 17, 1953, between Panhandle and the State to furnish the State with gas for the State Hospital; and there was no evidence that Panhandle took any part in the negotiations between the state officials and Miami, which negotiations resulted in the State cancelling its arrangement with Miami to furnish gas to it for the State Hospital.

The court further found that Panhandle had at all times furnished and was still furnishing to Miami all the volume of natural gas which Panhandle was obligated to deliver to Miami and which Miami had the right to demand from Panhandle under the service agreement of July 3, 1951.

The court concluded that Miami's cause of action against Panhandle was based on the contention that Panhandle wrongfully caused Miami to lose a customer; that the loss occurred on September 29, 1953, and that the instant action was not commenced until October 16, 1961, and was barred by the Kansas statute of limitations; and that Miami's claim to equitable relief was barred by "estoppel and laches"; and further that the service agreement between Miami and Panhandle was not breached by Panhandle and was still operative and being given full force and effect, both by Miami and Panhandle; and that Panhandle had no part in the termination of the arrangement between the State and Miami, whereby the latter was to furnish to the State gas for the State Hospital.

Judgment was entered in favor of Panhandle and Miami has appealed.

We think it clear that there was no breach by Panhandle of the contract of July 3, 1951; that Panhandle was not guilty of any act which caused the State to terminate its arrangement with Miami for the furnishing of gas by the latter to the State Hospital, and if there was any such act on the part of Panhandle, the cause of action therefor accrued on September 29, 1953, and is barred by limitation, estoppel and laches.

The judgment in favor of Panhandle is therefore affirmed, as is the judgment dismissing the action against the Welfare Board without prejudice.

## APPENDIX A

The Act of May 26, 1917, Kan.L.1917, ch. 297, § 1, Kan.R.S.1923, § 74–101, created a Board of Administration to manage the state institutions of Kansas.

Section 5 of such Act, Kan.R.S.1923, § 74–105, provided: "Said board shall constitute * * * the board of trustees or directors for all the educational, benevolent and penal institutions of the state of Kansas, and shall control and manage said institutions * * *."

Section 13 of the Act of May 26, 1917, Kan.L.1917, ch. 297, Kan.R.S.1923, § 76–107 provides that the Act of which it is a part contemplates the employment of an expert business manager for the business and scientific management of the state institutions covered by the Act and for the placing of all educational, beneficial and penal institutions of the State of Kansas under one management and one board of trustees or directors.

Section 14 of such Act, Kan.R.S.1923, § 76–108 provides: "The institutions to be under the control of such business manager and the state board of administration, shall be as follows: [Here are set forth the University of Kansas and other state educational institutions] * * *; also, the industrial school for girls, state industrial school for boys, the orphans' home, and such other benevolent institutions as now exist or may hereafter be created * * * [the section also enumerates the state penitentiary and other penal or corrective institutions]."

Section 17 of such Act, Kan.R.S.1923, § 76–111, provided: "The present board of directors of the various educational, benevolent, penal and corrective institutions referred to in this act, shall on and

after July 1, 1917, have no further legal existence, and the power heretofore exercised by them shall be and become vested in the state board of administration, and the state board of administration shall be, on July 1, 1917, and without further process of law, authorized and directed to assume and exercise all the powers vested in or exercised by the boards of the said respective institutions, and the state board of administration shall be and constitute the board of directors or trustees for each of said several institutions * * * and government of said various institutions, shall apply to and be performed by the state board of administration, the business manager and his assistants * * *."

Section 2 of the Act of July 1, 1925, Kan.L.1925, ch. 259; Kan.R.S.Supp. 1930, § 76–108a, provided that all the jurisdiction, powers and duties then conferred by law on the State Board of Administration relating to the University of Kansas, Kansas State Agricultural College and all branch experiment stations of such Agricultural College, Kansas State Teachers' Colleges at Pittsburg, Emporia and Hays, were withdrawn from the State Board of Administration and conferred upon the State Board of Regents, except that all the powers and duties then or thereafter conferred by law upon the State Business Manager relating to said educational institutions should be exercised by such Business Manager, by and through said Board of Regents.

Section 2 of the Act of April 1, 1933, Kan.L.1933, ch. 271, Kan.G.S.1935, § 74–108, provided that the Board should employ and appoint a Business Manager for all institutions covered by the Act and that such Business Manager should have full authority to manage and control such institutions, by and with the advice of "The Board."

Section 3 of the Act of April 2, 1937, Kan.L.1937, ch. 327, Kan.G.S.1947, § 39–703, created a State Board of Social Welfare, to be composed of five members appointed by the Governor. Its duties primarily were to cooperate with the Federal government and the counties of the State in furnishing assistance to the needy aged, needy blind, and dependent children and to supervise such welfare activities by county boards.

The Act provided: "All contracts shall be made in the name of 'the state board of social welfare of Kansas,' and in such name the state board may sue and be sued on such contracts."

The Act of March 28, 1939, Kan.L.1939, ch. 202, Kan.G.S.1947, § 75–3301, created a State Department of Social Welfare and provided it should consist of "the state board and such agents and employees as may be authorized and designated as such by the state board." It further provided in § 2 thereof: "The state board of social welfare shall consist of three members appointed by the governor * * *."

Section 7 of such Act provided: "All the jurisdiction, powers and duties now conferred by law upon the state board of administration relating to * * * the state hospital for the insane at Osawatomie * * * are hereby withdrawn from the state board of administration and conferred upon the state department of social welfare; except that all titles to real estate in connection with such institutions now vested in the state board of administration shall be and remain in the state board of administration and the powers and duties now or hereafter conferred by law upon the state business manager relating to the benevolent institutions herein named, shall be exercised by such business manager by and through said department of social welfare. [The section names other state institutions not here involved from which the jurisdiction, powers and duties conferred on the state board of administration were withdrawn and vested in the state department of social welfare.]"

The Act of March 31, 1939, Kan.L.1939, ch. 285, § 1, Kan.G.S.1947, § 74–101, amended previous statutes with respect to a Board of Administration and provided: "A board to manage the state

institutions set out and mentioned in section 3 of this act is hereby created, consisting of two members, both of whom shall be appointed by the governor, * * * and one of them shall be designated by the governor as chairman thereof. The board shall be known and called board of administration, which said board shall have all of the jurisdiction, powers and duties now conferred by law upon said board of administration as now constituted except as changed or modified by this act."

Section 3 of such Act amended § 74–105, G.S.Kan.1935, to read in part as follows: "Said board shall constitute the board of trustees for the state penitentiary * * * the state industrial farm for women * * * and the state industrial reformatory * * *."

Section 5 of such Act amended prior statutory enactments with respect to the State Business Manager and provided: "The board shall appoint a business manager for the institutions covered by this act and under its control, * * *. The said business manager under the direction of the state board of regents, state department of social welfare or board of administration, as the case may be, shall purchase all the supplies required by the institutions under the management and control of each of said boards and such purchases shall be made in the manner provided by law."

Section 1 of the Act of June 1, 1947, Kan.L.1947, ch. 425, in part provided: "The state department of social welfare shall consist of the state board established under * * * section 3 of this act, the division of institutional management established under the provisions of section 4 of this act, and such agents and employees as may be authorized and designated as such by the state board established under the provisions of section 3 of this act."

Section 3 of such Act in part provided: "The state board of social welfare provided for in section 75–3302 of the General Statutes Supplement of 1945 is hereby abolished. On and after the effective date of this act the state board of social welfare shall consist of two (2) members appointed by the governor * * *. The state board of social welfare created by this act is hereby authorized, empowered and directed to do all things necessary for the proper exercise of all the powers, duties, authority and jurisdiction conferred upon the state board of social welfare under the provisions of this act and as prescribed in article 7 of chapter 39 and article 33 of chapter 75 of the General Statutes [of Kansas] Supplement of 1945."

Section 1 of the Act of March 24, 1949, Kan.L.1949, ch. 446, amended § 1, Kan. L.1947, and in part provided: "There is hereby created a state department of social welfare which shall consist of the state board established under the provisions of section 2 of this act, the state director of social welfare, the division of social welfare, the division of institutional management,[1] and such agents and employees as may be authorized and designated as such pursuant to the provisions of this act."

Section 2 of such Act in part provided: "There is hereby created a state board of social welfare which shall consist of three (3) members appointed by the governor, * * *."

Section 12 of such Act in part provided: "The state board of social welfare provided for in section 75–3302b of the General Statutes Supplement of 1947 is hereby abolished, and all of its properties and all the powers, duties, authority and jurisdiction now exercised by and imposed by law upon the state board of social welfare and the state department of social welfare by article 7 of chapter 39 and article 33 of chapter 75 and article 17a of chapter 76 of the General Statutes Supplement of 1947 are hereby transferred to and imposed and conferred upon the state department of social welfare created under the provisions of sec-

---

1. The Division of Institutional Management as provided for by § 5 of the Act, but its functions have no relevancy here.

tion 1 of this act and said state department of social welfare is hereby empowered and directed to do all things necessary for the proper exercise of all such powers, duties, authority and jurisdiction in the manner as provided in this act."

Section 2 of the Act of March 15, 1951, Kan.L.1951, ch. 288, amended § 8 of the Act of April 9, 1949, Kan.G.S. 1949, § 39–708, to read in part as follows:

"(k) All contracts shall be made in the name of 'the state board of social welfare of Kansas,' and in such name the state board may sue and be sued on such contracts." [2]

The same provision appears in Kan. G.S.1961 Supp. § 39–708(k).

---

[2] The amendment made no change in subsection (k).