The ANSCHUTZ CORPORATION, Plaintiff,

v.

NATURAL GAS PIPELINE COMPANY OF AMERICA; Harp Limited Partnership; Piedmont Minerals Company; Damson Oil Corporation; Damson 1981–82 Oil and Gas Income Fund, Series 1982–2; Damson 1982–83 Oil and Gas Income Fund, Series 1983–1; Hugh G. Braly, as Trustee of Fred B. Anschutz; Anschutz Family Foundation; Anschutz Land and Livestock Co., Inc.; Antelope Company, Defendants.

No. C 85–0788A.

United States District Court, D. Utah, C.D.

April 1, 1986.

Brent V. Manning, Holme, Roberts & Owen, Salt Lake City, Utah, for plaintiff.

Robert W. Hughes, Hughes, Russell & McPhee, Salt Lake City, Utah, for defendant Natural Gas.

Jay D. Gurmankin, Giauque & Williams, Salt Lake City, Utah, for Damson Parties.

MEMORANDUM OPINION AND ORDER ON MOTIONS TO REMAND AND MOTION TO DISMISS OR STAY THE ACTION

ALDON J. ANDERSON, Senior District Judge.

## I. INTRODUCTION

On April 11, 1985, Natural Gas Pipeline Company (hereinafter "Natural") filed a complaint against Anschutz Corporation (hereinafter "Anschutz") in federal district court in Chicago.[1] On June 4, 1985, in Utah state court, Anschutz filed an action for a declaratory judgment on the same contracts that are the subject of the federal action in Illinois. In addition to Natural, Anschutz joined eleven other parties as defendants in the action.[2]

On July 3, 1985, Natural filed a Verified Petition for Removal and a Motion to Dismiss or Stay this action pending the outcome of the case in federal district court in the Northern District of Illinois. Anschutz then filed a Motion to Remand. Five of the defendants referred to collectively as the "Damson Parties" also filed a Motion to Remand. Following several exchanges of memoranda supporting and opposing these various motions, oral argument was heard on December 17, 1985. At the conclusion of oral argument, this court took the case under advisement.

## II. FACTS

Anschutz is in the business of exploring for, producing and selling natural gas. Natural is an interstate pipeline in the business of purchasing and reselling natural gas to utilities for distribution to ultimate consumers living primarily in northern Illinois. These two parties entered into two contracts with each other which form the basis for this action.

The first Gas Purchase Contract was executed in 1979. The second contract was executed in 1981. Both contracts obligate Natural to purchase certain quantities of natural gas attributable to Anschutz's working interests in various gas fields. Following the execution of these contracts, the price of natural gas fell and it became possible for Natural to obtain gas from other sources at less expensive rates. As a result, a dispute arose between the two regarding the quantity of gas that Natural was obligated to take under the two contracts. Attempts at negotiation between the two parties failed and they each subsequently filed an action, Natural in federal court in Illinois and Anschutz in Utah state court.

From 1976 to 1983 a number of royalty interests in the gas production were created and assigned to various parties. On February 23, 1976, lease agreements were executed between Anschutz and Anschutz Land & Livestock Co. and between Anschutz and Antelope Co. Each of these two lease agreements included both a 1/8th royalty interest and an overriding royalty interest in the gas production. On October 24, 1980, Antelope assigned part of its overriding royalty interest to Harp Limited Partnership. On May 7, 1980, Piedmont Minerals Co. received an overriding royalty

---

1. *Natural Gas Pipeline Company of America v. The Anschutz Corporation,* No. 85-C-3446 (N.D. Ill.).

2. The eleven defendants other than Natural are listed in the Complaint as follows: HARP LIMITED PARTNERSHIP, a New York limited partnership; PIEDMONT MINERALS COMPANY, a Colorado General Partnership; DAMSON OIL CORPORATION, a Delaware Corporation; DAMSON 1981–82 OIL AND GAS INCOME FUND, SERIES 1982–2, a Pennsylvania limited partnership; DAMSON 1982–83 OIL AND GAS INCOME FUND, SERIES 1982–3, a Pennsylvania limited partnership; DAMSON 1982–83 OIL AND GAS INCOME FUND, SERIES 1982–4, a Pennsylvania limited partnership; DAMSON 1982–83 OIL AND GAS INCOME FUND, SERIES 1983–1, a Pennsylvania limited partnership; HUGH G. BRALY, as Trustee under the Trust Agreement of Fred B Anschutz for the benefit of Sue Anschutz Rodgers and Issue dated May 28, 1977; ANSCHUTZ FAMILY FOUNDATION, a Colorado non-profit corporation; ANSCHUTZ LAND AND LIVESTOCK CO., INC. a Kansas corporation; and ANTELOPE COMPANY, a Colorado limited partnership. (The Damson Oil Corporation and the several Damson Income Funds are referred to collectively in the briefs and in this opinion as "the Damson Parties").

interest from Livestock and Antelope. On August 8, 1983, the Damson Parties each received an overriding royalty interest from Antelope. The Anschutz Family Foundation and Hugh G. Braly as Trustee also acquired some interest which need not be further detailed here. (For a more complete description of the creation and assignment of these interest *see* Anschutz's Amended Memorandum in Support of Petition to Remand and in Opposition to Natural's Motion to Dismiss or Stay, (hereinafter "Anschutz's Memorandum Supporting Remand") at Appendix A.

## III.  ANALYSIS

This court need not consider Natural's Motion to Stay or Dismiss unless it first finds that the case has properly been removed to this court. Consequently, the court first will examine the motions to dismiss. Although separate motions to dismiss were filed by plaintiff Anschutz and the Damson party defendants, the issues involved in the two motions are the same and are discussed together.

### A.  Motions to Dismiss

Natural bases its petition for removal on 28 U.S.C. § 1332, establishing federal court jurisdiction in actions between citizens of different states. Natural states that it is a Delaware corporation with its principal place of business in Illinois. Natural's petition further states that Anschutz is a Kansas corporation with its principal place of business in Colorado. As to the other eleven defendants, Natural argues that they have been fraudulently joined in the action making their citizenship irrelevant for purposes of determining diversity between the parties.

The parties have not disputed the citizenship of any party to the proceeding. Natural concedes that if the citizenship of all of the parties currently joined in the action is considered, complete diversity does not exist.[3]

### 1.  Realignment of Parties.

There is some dispute over the proper alignment of the eleven defendants other than Natural. These parties hold lessor's royalty interests and overriding royalty interests in the gas produced by Anschutz and sold to Natural under the contracts. Anschutz's complaint states no cause of action against the eleven defendants (*see* Anschutz's State Court Complaint filed as Appendix A to Natural's Verified Petition for Removal), and the facts demonstrate that these parties' interests in the action, if any, are aligned with the interest of the plaintiff.[4] Anschutz's position is that Natural is obligated to purchase more gas under the gas purchase contract than Natural claims it is obligated to buy. If the royalty holders gain at all by this action it can only result from an interpretation of the contract which obligates Natural to purchase more gas than it wants to purchase. These two positions are congruent.

■ When a federal court examines a case to determine if it has jurisdiction based on diversity, the court must realign the parties according to their real interests in the litigation before determining diversity:

---

**3.** They disagree about the proper alignment of the eleven defendants other than Natural. For purposes of diversity, it does not matter whether these parties are classified as plaintiffs or defendants; either way, diversity is destroyed. If they are aligned as plaintiffs, then plaintiff Damson Oil Corporation and defendant Natural, both citizens of Delaware, would prevent complete diversity of citizenship. If the parties remain aligned as defendants, then plaintiff Anschutz and defendants Piedmont Minerals Company and Anschutz Family Foundation, each a citizen of Colorado, destroy diversity.

**4.** In their brief, the Damson Parties agree that their only interest in the litigation is consistent with the interests of Anschutz and opposed to the interests of Natural. Damson's Memorandum in Support of Motion to Remand at 4 ("[T]heir real interests conform to the interests of plaintiff Anschutz"). Although Anschutz is more reluctant to concede this point, it essentially admits that their interests are consistent. Anschutz's Memorandum Supporting Remand, at 9–10 ("It is not surprising, therefore, that the interests [of Anschutz and the eleven defendants] may be consistent ...").

In diversity suits, courts will scrutinize the interests of the parties in order to determine if their positions as plaintiffs and defendants conform to their real interests. When appropriate, parties will be realigned; however, this is to be done only after real rather than apparent interests have been ascertained.

*Farmers Alliance Mutual Insurance Co. v. Jones*, 570 F.2d 1384, 1387, *cert. denied*, 439 U.S. 826, 99 S.Ct. 97, 58 L.Ed.2d 119 (1978). Based on the doctrine of realignment, if the eleven defendants are found to have a "real interest" as plaintiffs in the case, the court must realign them for purposes of determining diversity jurisdiction. Realignment presumes that the party will have some interest in the action. Despite the lack of interest as defendants in this action, realignment is still not appropriate unless they have "real interests" as plaintiffs.

**a. Interests of Eleven Defendants as Plaintiffs.** The action before the court in this case was brought under the Utah Declaratory Judgments Act, Utah Code Ann. §§ 78–33–1, *et seq.* (1953). Section 78–33–11 describes the necessary and proper parties to a declaratory judgment action:

When declaratory relief is sought all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding.

Although the language of the statute is worded broadly, the definition of "any interest" must have limits beyond which the interest is too tangential to make it a proper part of a declaratory judgment action. The Utah Supreme Court has identified such limits. In *Main Parking Mall v. Salt Lake City*, 531 P.2d 866 (Utah 1975), the court stated:

A party maintaining an action under the Declaratory Judgments Act must have a substantial interest or a legally protectible interest in the subject matter of the litigation.

*Id.* at 867 (citations omitted). The plaintiff argues that this standard only applies to a party bringing the action. (Reply Memorandum of Plaintiff in Support of Petition to Remand, at 14 n. 7). Certainly, the subject of the court's inquiry in *Main Parking Mall* was the interest of the party bringing the action. This court is not persuaded, however, that the Utah supreme court intended to limit the application of its stated standard to only those who "bring" an action. In an earlier case, the court noted that a tort victim, joined as a defendant, had "no present legal interest" in the insurance contract between a tortfeasor and his insurer. The amount of damages that the tort victim could recover might very well be dependent on the determination of the insurer's liability. Without limits on the interpretation of "any interest," such a tort victim would appear to be a proper party to the declaratory action. The court stated, however:

Had [the tort victim defendant] objected to his joinder in this action ... it would have been error to have compelled his joinder even under a most liberal view of Rule 20, Utah Rules of Civil Procedure, and we want to repel any inference which may be drawn from this opinion that one who claims to be damaged by the negligent act of another, is a proper party to an action by the insurer of the latter under a public liability policy, whereby a declaratory judgment is sought declaring the legal effect of the terms of such policy.

*Utah Farm Bureau Insurance Co. v. Chugg*, 6 Utah 2d 399, 315 P.2d 277, 281 (1957). The plaintiff attempts to draw fine distinctions in the language used by the court in *Chugg* thus narrowing the application of the *Chugg* reasoning to the point that it is inapplicable to any case beyond a very narrow set of facts. (Plaintiff's Reply Brief at 13, n.6). As the language quoted above demonstrates, however, the court spoke in terms of tort victims, tortfeasors and insurers in general without any implication that the decision was dependent upon whether the tort victim had already commenced an action.

■ Furthermore, for purposes of the instant case, such a distinction is irrelevant. Although the overriding royalty holders were joined as defendants in the action, the court must determine what interest they might have if they are realigned as plaintiffs. As a result, only their interests as potential plaintiffs need be considered for our purposes. Although they did not technically "bring" this action, their interest in the case puts them in the same position as if they had brought the action. This court finds that to be realigned as plaintiffs the defendants must have a "substantial interest or a legally protectible interest" in the contracts involved in this action.

■ Realignment of the parties is considered only for the purposes of determining diversity jurisdiction. For this purpose, the court need only review the joinder of those parties that serve to destroy diversity jurisdiction. If the eleven royalty holders are realigned as party plaintiffs for purposes of determining diversity, only the presence of Damson Oil Corporation as a plaintiff would destroy diversity.[5] Consequently, the court only needs to determine if realignment is proper for the Damson Party defendants.[6] To the extent that other defendants have interests that differ from those of the Damson Parties, the court need not determine whether these other interests would make realignment of those parties proper.[7]

In order to assess the Damson Parties interest, if any, in this action, the court must determine whether the Damson parties are parties, principals, or third-party beneficiaries under the 1979 and 1981 contracts between Natural and Anschutz. The court must also determine whether the Damson Parties are assignees of rights under the contracts in question. The Damson parties received the assignments of the overriding royalty interests they currently own in 1983. The contracts in dispute were executed by Anschutz and Natural in 1979 and 1981. Since the Damson parties did not even gain the interest they presently have until nearly two years after the second contract was executed, they clearly are not parties or principals to the contracts. Their only claim to an interest in the contracts is, therefore, either as assignees of rights under the contracts or as third party beneficiaries.

■ **b. Damson Parties' Interest as Assignees Under the Contract.** Anschutz and Damson argue that the overriding royalty holders were granted an in-kind interest in the gas itself. As such owners they are also assignees of the right to receive payment for their portion of the gas taken by Natural pursuant to the gas purchase contracts. They further reason that Anschutz continues to receive full payment from Natural and is therefore acting as their agent as to the gas that they own. Since the gas purchase contract between Natural and Anschutz governs the sale of their gas they claim that they have a right to bring an action against Natural directly to enforce the rights they have been assigned and are entitled to as in-kind owners of a portion of the gas.

■ **Ownership of Gas In-kind Under the Overriding Royalty.** The assignment and agency arguments center around the question of whether the Damson parties

5. Damson Oil Corporation and Natural Gas Pipeline are both Delaware corporations.

6. Although only the citizenship of Damson Oil Corporation destroys diversity, the Damson Parties allege in their Motion to Remand and the accompanying Memorandum that Damson Oil Corporation is a general partner of the Damson Income Funds. Damson Parties' Motion to Remand at ¶ 4; Damson's Memorandum in Support of Motion to Remand, at 3 n. 1, 5 n. 2. The citizenship of a general partner of a limited partnership must be considered for purposes of diversity. *See* 13B *C. Wright, A. Miller, E. Coo-*

*per, Federal Practice and Procedure* § 3630 at pp. 682–83 (2d ed. 1984).

7. For example, Anschutz claims that the royalty interests provided in the lease agreements between Anschutz and Anschutz Land and Livestock Co. and between Anschutz and Antelope Island Cattle Co. create unique interests in Livestock and Antelope as lessors. Anschutz also claims that defendant Braly holds an ownership interest in Anschutz's working interest. *See* Plaintiffs Reply Memorandum, at 21–25.

have a right to take the gas in-kind. The Damson parties' claim to an ownership interest in the gas arises from an Assignment of Overriding Royalty Interest from Antelope Company[8] to Damson Oil Corporation, and the various Damson Income Funds, dated August 8, 1983 (Exhibit J to Anschutz's "Complaint for Declaratory Judgment" C85–3539 (3rd Dist.Utah)) (hereinafter "Overriding Royalty Assignment") (Complaint and Exhibit J to the Complaint are included in Exhibit A to Natural's Verified Petition for Removal in the instant action). The assignment grants the Damson parties:

> [A]n overriding royalty interest equal to an undivided one percent of all oil, gas, condensate and all minerals associated therewith (collectively, "Hydrocarbons") *produced, saved and sold* from or, pursuant to any valid, and effective pooling, unitization or communitization agreement, *produced, saved and sold* from other lands and allocated to, those subsurface depths of the land described in Exhibit "A" ... under and pursuant to the lease described in Exhibit "A" or any future oil and gas lease affecting the Land.

Overriding Royalty Assignment at 1 (emphasis added). Paragraph "G" of the assignment further provides:

> Except as may be otherwise provided in this Assignment, the Overriding Royalty Interest *shall be treated, computed, paid and delivered to Assignee in the same manner and under the same terms and conditions as are provided in the Lease for the payment or delivery of royalties to the lessor therein* ...

*Id.* at 2 (emphasis added). The manner of computing the lessor's royalty is provided for in the lease agreement between Anschutz and Antelope Island Cattle Co.:

> The *royalties to be paid by Lessee* are: ... (b) on gas, including casinghead gas or other substance, produced from said land and sold or used off the premises or in the manufacture of gasoline or other

products therefrom, *the market value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale* ...

Oil and Gas Mineral Lease between Antelope Island Cattle Co. (lessor) and Anschutz (lessee) ¶ 3 (February 23, 1976) (Contained in Exhibit A to Natural's Verified Petition for Removal, labeled as Exhibit A–2 to Anschutz's state court Complaint) (emphasis added). The method of computing the royalty in the lease agreement and incorporated through paragraph "G" into the overriding royalty is acknowledged by Kuntz as one method of providing for payment of a royalty in money:

> It is not uncommon for a gas royalty clause ... to use the market value to determine the royalty if there are no sales at the well and to use the sale price if there are sales.

3 *E. Kuntz, Oil and Gas* § 40.4, at p. 302 (1967).

The provisions of the Overriding Royalty Assignment and the lease taken together give the Damson parties a right to receive *payments in money* for gas rather than a right to take gas in kind. The provisions of these agreements do not contain language that suggests an in kind interest. Professor Kuntz states:

> Although occasionally the royalty clause of an oil and gas lease may provide for a fixed gas royalty or for the delivery of the gas royalty in kind, it is more common for the gas royalty provision of the royalty clause to provide for the payment of the gas royalty in money in an amount to be determined ...

*E. Kuntz, supra* at § 40.4, p. 301. *See also R. Hemingway, Oil and Gas,* § 7.5 at 365 (1983) ("Under the customary gas royalty clause the lessee is required to account to the lessor or royalty owner for the value of the gas produced. Title to the gas passes to the lessee upon execution of the lease. The relationship between the lessee and the

---

**8.** Antelope Company received its interest through a General Conveyance, Assignment and

Assumption dated May 26, 1982 from Antelope Island Cattle Company.

lessor is not one of principal and agent, but of debtor and creditor"); Sullivan, *All About Royalties,* 16 *Rocky Mtn. Min. L. Inst.* 227, 247 (1970).[9] Once it is determined that the royalty provides for a right in money, it is clear that title to the gas will be in the lessee. The Tenth Circuit, upon finding that a gas royalty was for "proceeds," stated:

> It is well settled that the provision concerning the payment for gas operates to divest the lessor of his right to obtain title in himself by reduction to possession and that thereafter his claim must be based upon the contract with the one to whom he has granted that right. His claim can only be for a payment in money and not for the product itself.

*Greenshields v. Warren Petroleum Corp.,* 248 F.2d 61, 67 (10th Cir.), *cert. denied,* 355 U.S. 907, 78 S.Ct. 334, 2 L.Ed.2d 262 (1957).

Anschutz argues that the existence of both a royalty clause and an overriding royalty clause in the lease between Anschutz and Antelope "clearly means that they have different purposes." Plaintiff's Reply Memorandum at 16. Therefore, Anschutz argues, even if the royalty clause is limited to payments in money, the overriding royalty interest, part of which was assigned to the Damson parties, is a separate in-kind grant of an interest in the gas. This argument is not persuasive. The royalty clause is contained in the body of the lease agreement and provides for a 1/8th interest. The lease is a typical form lease

used in Colorado. The royalty provision is nearly identical to form book provisions that are widely used. *Compare* ¶ 3 of the lease *with* 7 *H. Williams and C. Meyers, Oil and Gas Law,* §§ 699, 699.7 (1981) (Section on Oil and Gas Forms) (the royalty clauses contained in most of the form leases are very similar to this one; the Texas lease form at § 699.7 contains a royalty clause virtually identical to this clause). The overriding royalty, included in the Rider to the lease agreement, gives the lessor an additional 5% interest. The existence of two separate royalty clauses suggests nothing more than that the parties agreed to give the lessor more than the standard ⅛th interest provided in the form lease. *See H. Williams & C. Meyers, Manual of Oil and Gas Terms,* 606–08 (1984) (definition of "Overriding Royalty") ("While usage varies some, any royalty created out of the working interest in a lease is overriding royalty and many people also *refer to any royalty reserved by the lessor in addition to the usual one-eighth royalty as overriding royalty* " (emphasis added) ).[10] The interest conveyed by the overriding royalty is in gas "sold" from the leased premises.[11] This additional grant evidences only an intent to give additional value to the lessor not an intent to grant an interest of a different type.

Both the Lease and the subsequent Assignment of Overriding Royalty Interest support the argument that the Damson

---

**9.** Professor Williams similarly states:

> Although as has been indicated in an earlier subsection, payment in kind provisions are common in oil royalty clauses, such provisions are only infrequently found in gas royalty clauses. Instead the lease requires some payment to be made to the lessor for the gas produced.

3 *H. Williams, Oil and Gas Law* § 643.1, at p. 517 (1985). Williams offers several examples of royalty clauses that express a payment obligation rather than an in kind grant. One example reads:

> The royalty to be computed, levied and collected on gas obtained from every location, acquired under this lease, consumed for some useful purpose off the location or sold shall be ...

*Id.* (ellipsis in original). The examples which Williams provides on in kind grants, contrast-

ingly, do not make reference to the *sale of* or *payment for* gas. *Id.* at p. 518. *See also* McDermott, *Fee Oil and Gas Lease Royalty—Variations and Problems,* 28 *Rocky Mtn. Min. L. Inst.* 1171, 1185–90, 1194 (1982) (author gives five examples of gas royalty clauses and states that payment under each of the clauses is in money and not in kind; "As such, the lessee acquires title to all of the gas produced and, in effect, makes a promise to pay which gives rise to a personal obligation on the part of the lessee").

**10.** *See also Id.* at 770 (definition of "Royalty"—authors describe the use of a royalty and overriding royalty in a single lease).

**11.** *See* note 9, *supra* for a discussion on the sale of gas or for "gas sold."

parties hold an interest in proceeds of the sale of gas and not an in kind interest in the gas itself.

The actions and relationships of the parties do not change this analysis. The overriding royalty holders have never asserted a right to the receipt of gas in kind. No royalty holder was privy to the two contracts between Anschutz and Natural; the Damson parties received their overriding royalty interests nearly two years after the second contract was executed between Anschutz and Natural. A division order has never been entered and Natural has never made payments to a party other than Anschutz. The court finds that the Damson parties do not "own" any of the gas that is part of the subject matter of the contracts in dispute.

**c. Third-Party Beneficiary Status.** Anschutz has asserted that some of the defendants have an interest in the Anschutz/Natural contracts as third party beneficiaries. This argument was made, however, only on behalf of the owners of the lessor's royalty interests and net profits interests, specifically Livestock, Antelope, and Braly. *See* Anschutz's Memorandum Supporting Remand at 16. The court need not decide this argument since none of the Damson parties hold either of these types of interests.

The Damson parties do not own an in-kind interest in the gas which is the subject matter of the contracts in dispute. The interests that were assigned are interests in the profits generated by the lease agreement between Anschutz and Antelope, not interests in the sales contracts between Anschutz and Natural. Although the overriding royalty holders may benefit from an interpretation of the sales contracts favorable to Anschutz, they are at most only incidental beneficiaries of the contracts.

Having reviewed the potential theories under which the Damson parties could claim an interest in the contracts between Anschutz and Natural, the court concludes that the Damson parties have no "substantial interest or legally protectible interest" in the subject matter of the litigation.

*Main Parking Mall,* 531 P.2d at 867. Consequently, the Damson parties cannot be joined as party plaintiffs in the declaratory judgment action. Since they have no real interest as plaintiffs in the action, it is improper to realign them as plaintiffs. The Delaware citizenship of Damson Oil Corporation will not, therefore, be considered in determining diversity.

As discussed earlier, no cause of action exists against any of the eleven defendants as defendants. The complaint states no cause of action against them. Under the case law that has developed for cases of fraudulent joinder and cases under Rule 21 of the Federal Rules of Civil Procedure, this court can drop the eleven defendants as parties to this action.

**2. Fraudulent Joinder.**

The court must decide whether the royalty holders have been fraudulently joined for the purpose of defeating diversity jurisdiction. The most definitive statement on fraudulent joinder by the Tenth Circuit is found in the case of *Dodd v. Fawcett Publications, Inc.,* 329 F.2d 82 (10th Cir.1964):

> In many cases, removability can be determined by the original pleadings and normally the statement of a cause of action against the resident defendant will suffice to prevent removal. But upon specific allegations of fraudulent joinder the court may pierce the pleadings, consider the entire record, and determine the basis of joinder by any means available. The joinder of a resident defendant against whom no cause of action is stated is patent sham, and though a cause of action be stated, the joinder is similarly fraudulent if in fact no cause of action exists.

*Id.* at 85 (citations omitted). *See also Miami Pipe Line Co. v. Panhandle Eastern Pipe Line Co.,* 384 F.2d 21, 27 (10th Cir. 1967); *Roe v. General American Life Insurance Co.,* 712 F.2d 450, 452 n. * (10th Cir.1983). The Federal District Court for the District of Colorado, upon reviewing Tenth Circuit precedent stated: "Where no cause of action is stated against the non-di-

verse party—in other words where the plaintiff could not conceivably recover from the non-diverse defendant in state court—a federal court may reasonably infer that the joinder was fraudulent. *Dailey v. Elicker,* 447 F.Supp. 436, 438 (D.Colo.1978). For a short summary of federal fraudulent joinder law generally, see Comment, *Federal Jurisdiction and Practice: Fraudulent Joinder to Prevent Removal, 27 Okla.L. Rev.* 264 (1974).

■ The court finds that facts in the current case properly establish a case of fraudulent joinder. Specifically, the Damson parties have no interest as plaintiffs in the action; Damson's Delaware citizenship will, therefore, not be considered. Secondly, there is no cause of action that is or can be stated against the eleven defendants as defendants. As a result the non-diverse citizenship of the plaintiff Anschutz and defendants Anschutz Land and Livestock Co., Piedmont Mineral Co., Anschutz Family Foundation and Hugh G. Braly as Trustee will not prevent diversity of citizenship. *See Anschutz's Memorandum Supporting Remand* at 8 n. 4 (Anschutz sets forth the citizenship of the above named parties and Natural has not disagreed with the statements as to citizenship). As a result of these conclusions, the court finds that complete diversity of citizenship exists between the plaintiffs and defendants in the case.[12]

**B.  Natural's Motion to Stay or Dismiss**

■ Upon reviewing Natural's Complaint filed in the Northern District of Illinois and Anschutz's Complaint filed in the instant case, the court concludes the complaint in this case is substantially similar to Counts VI–VIII of the Illinois complaint. Although additional defendants are joined as parties in this action, there is no cause of action stated against them. In both

cases, contracts solely between Anschutz and Natural are in dispute. Under the circumstances, the motion to stay or dismiss should be granted. The Tenth Circuit has set forth the standard that is to be followed:

> The rule is that the first federal district court which obtains jurisdiction of parties and issues should have priority and the second court should decline consideration of the action until the proceedings before the first court are terminated. The simultaneous prosecution in two different courts of cases relating to the same parties and issues "leads to the wastefulness of time, energy and money."

*Cessna Aircraft Co. v. Brown,* 348 F.2d 689 (10th Cir.1965) (citations omitted). *See also O'Hare Int'l Bank v. Lambert,* 459 F.2d 328, 331 (10th Cir.1972). Anschutz argues that stay or dismissal is disfavored even though similar suits are pending in separate jurisdictions. Natural correctly points out, however, that Anschutz's arguments and the cases it cites apply to state-federal concurrent jurisdiction and not federal-federal jurisdiction.[13]

In this case, staying the action would be an idle act. The issues and properly joined parties are identical. In a recent Fifth Circuit decision, the court thoroughly analyzes the federal case law on this point and summarizes:

> The concern manifestly is to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result. To avoid these ills, a district court may dismiss an action where the issues present can be resolved in an earlier-filed action pending in another district court. In particular, "[a] court may ... in its discretion dismiss a declaratory

---

12. Fed.R.Civ.P. 21 might also be used in this case to drop the nondiverse parties. *See, e.g., Miller v. Leavenworth-Jefferson Electric Cooperative, Inc.,* 653 F.2d 1378, 1382–83 (10th Cir. 1981).

13. *See Colorado Water Conservation District v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236,

1246, 47 L.Ed.2d 483 (1976) for a discussion of the difference between the two types of concurrent jurisdiction and the general rule that duplicative litigation should be avoided as between different districts of the federal court. *See also* 1A *J.* Moore, W. Taggart, A. Vestal & J. Wicker, *Moore's Federal Practice* ¶ 0.203[4] (2d ed. 1985).

judgment or injunctive suit if the same issue is pending in litigation elsewhere." *West Gulf Maritime Assoc. v. ILA Deep Sea Local 24*, 751 F.2d 721, 729 (5th Cir.) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 155, 87 S.Ct. 1507, 1519, 18 L.Ed.2d 681 (1967) (other citations omitted), *cert. denied,* —— U.S. ——, 106 S.Ct. 133, 88 L.Ed.2d 110 (1985). *See also Pacesetter Systems, Inc. v. Medtronic, Inc.*, 678 F.2d 93, 94–97 (9th Cir.1982). Federal comity strongly argues for dismissal in this case. The declaratory judgment pending in the United States District Court for the Northern District of Illinois will resolve all of the issues involved in this action.

### IV. CONCLUSION

Complete diversity of citizenship exists between Natural and Anschutz. Although the citizenship of some of the additional defendants would destroy diversity, they do not have an actual interest in the action and no cause of action has been stated against them. As a result, the citizenship of these parties will not be considered in determining citizenship. Damson Oil Corporation, if realigned as a plaintiff, would also destroy diversity. The Damson parties, however, do not have an interest that will justify such a realignment. An action filed in federal court in Illinois prior to the filing of this action addresses all of the issues involved in this action. Judicial economy and comity favor dismissing this action.

The court hereby ORDERS that the Motions to Remand by Plaintiff Anschutz and the Damson Party defendants be DENIED. The Court FURTHER ORDERS that Defendant Natural's Motion to Dismiss this action be GRANTED.