CIG EXPLORATION, INC., Plaintiff,

v.

Lavon S. HILL, et al., Defendants.

No. 91–C–965W.

United States District Court,
D. Utah, C.D.

June 22, 1993.

---

Larry P. Ellsworth, Debra K. Brousard, Mark Tempest, Houston, TX, Allan T. Brinkerhoff, Salt Lake City, UT, for plaintiff.

A. John Davis, Brent A. Bohman, Salt Lake City, UT, for defendants Conoco Inc., Hanover Petroleum Corp. and Tenneco Oil Co.

R. Willis Orton, Ronald F. Price, Salt Lake City, UT, for defendants Enron Oil & Gas Co., et al.

## MEMORANDUM DECISION AND ORDER

WINDER, District Judge.

This matter is before the court on the Motion for Summary Judgment filed by Conoco Incorporated, Hanover Petroleum Corporation, and Tenneco Oil Company (collectively "Conoco Defendants"), and joined in by Defendants Enron Oil & Gas Co., et al. ("Enron Defendants").[1] A hearing on this motion was held on April 16, 1993. The Conoco Defendants were represented by A. John Davis and Brent A. Bohman. The Enron

---

1. After the court took this matter under advisement, Enron Oil and Gas Company and CIGE settled their differences and filed a Notice of Voluntary Dismissal with the court on May 28, 1993. Notwithstanding this dismissal, for purposes of convenience in this Memorandum Decision and Order the court refers to the Defendants represented by the firm of Callister, Duncan & Nebeker as the Enron Defendants. Where appropriate, the court refers to the Conoco Defendants and the Enron Defendants collectively as Defendants.

Defendants were represented by R. Willis Orton and Brian W. Burnett. Plaintiff CIG Exploration, Inc. ("CIGE") was represented by Debra K. Broussard, Jeffrey M. Goldsmith, and Allan T. Brinkerhoff. Before the hearing, the court considered carefully the memoranda and other materials submitted by the parties. Since taking the matter under advisement, the court has further considered the law and facts relating to the motion for summary judgment. Now being fully advised, the court renders the following Memorandum Decision and Order.

## I. BACKGROUND [2]

During the early 1970s, Colorado Interstate Gas Company ("CIG"), which operated an interstate gas pipeline, began to experience gas shortages prompting the need to explore for and develop additional gas reserves. Accordingly, CIG created a wholly owned subsidiary, CIGE, to conduct a gas search program. Thereafter, CIG and CIGE sought the approval of the Federal Power Commission to create a special gas search program (the "gas search program") whereby CIG's resale customers would partially fund the program through the payment of higher prices for gas. Several parties intervened in the FPC proceedings, including the Public Utilities Commission of the State of Colorado ("PUCC") and several of CIG's resale customers.

On September 12, 1973, the parties to the FPC proceedings entered into a Stipulation and Agreement of Settlement (the "1973 Stipulation"), which the FPC approved in 1974. Defendants are not parties to that stipulation. The 1973 Stipulation authorized CIG to transfer to CIGE its producing leases and related production facilities. To obtain funds for the gas search program, CIGE was authorized to sell gas from the producing leases transferred from CIG to CIGE at prevailing "area rates," which were higher than the prices CIGE would have otherwise been entitled to charge for that gas under the Natural Gas Act of 1954. CIGE agreed to dedicate all new gas discovered and developed pursuant to the gas search program ("new gas") to CIG's system "under life-of-the-field contracts, under terms and conditions reasonable and customary for gas purchase contracts with independent producers relating to reserves of comparable quality, nature and location." 1973 Stipulation, Art. II.7, at 22–23 (attached as Exhibit C to Conoco Def.s' Mem.Supp. M. Summ. J.). Additionally, CIGE agreed to sell the new gas to CIG at prevailing "area rates," or in the event of deregulation, at the area rate in effect prior to deregulation, to be adjusted upward at the rate of 1.5 cents per MCF for each year subsequent to deregulation. Finally, CIGE agreed that it would not "charge rates for any New Gas under any pricing procedure or formula other than as set forth in this Section 7" of the stipulation. 1973 Stipulation Art II.7, at 23.

In 1978, the United States Congress enacted a new regulatory scheme contained in the Natural Gas Policy Act of 1978, Pub.L. No. 95–621, 92 Stat. 3350, 3352 (codified as amended at 15 U.S.C. §§ 3301–3342 (West 1982 & Supp.1993)) ("NGPA").[3] The NGPA provided for an incentive-based pricing structure that permitted higher prices for certain categories of gas than the cost-based pricing structure under the previous Natural Gas Act. The NGPA permitted special (higher) incentive-based prices for high cost natural gas produced from tight formations known as "tight sands" gas. 15 U.S.C.A. § 3317(c)(5) (West 1982). Under Federal Energy Regulatory Commission ("FERC") regulations, however, a producer could charge tight sands incentive prices only if there existed a "negotiated contract price" with the customer authorizing the higher prices. 18 C.F.R. § 271.703 (1990). The stated purpose of this requirement was to "insure that the incentive maximum lawful price is extended as an incentive for the production of additional new

---

**2.** The following facts generally are undisputed and generally are taken from the Statement of Undisputed Facts in the Conoco Pl.s' Mem.Supp. M. Summ. J. Where CIG has disputed an element of Conoco's factual statement, the court notes the dispute and cites to the appropriate memoranda.

**3.** Congress repealed the NGPA in 1989. *See* Pub.L. 101–60, 103 Stat. 157, 158 (1989). All citations to the NGPA are to the 1982 volume of the United States Code Annotated, unless otherwise indicated.

tight formation gas, rather than as a windfall to the sellers." FERC Statute and Regulations (Regulation Preambles 1977–81), 30,183 at 31,271 (1980).

In 1981 CIGE commenced charging CIG the tight sands incentive prices. In turn, CIGE paid royalties to the Conoco and Enron Defendants on the basis of these increased gas revenues. In an attempt to qualify to charge the tight sands incentive prices, CIG and CIGE amended their pertinent gas purchase contracts to provide the requisite "negotiated contract price" language. CIG and CIGE did not, however, obtain the approval of the other parties to the 1973 Stipulation, many of whom were CIG's resale customers.

In 1982 the Public Service Company of Colorado and other of CIG's resale customers and parties to the 1973 Stipulation filed suit in Colorado state court for breach of the 1973 Stipulation. CIG's resale customers contended passage of the NGPA constituted an act of deregulation within the meaning of section 7 of the 1973 Stipulation, thereby triggering the 1.5 cent MCF per annum price escalation provision. Additionally, CIG's resale customers contended that tight sands prices were not allowable under the terms of the 1973 Stipulation because they had not consented to the 1981 Amendments to the Gas Purchase Contracts authorizing those prices.

On July 24, 1985, the administrative law judge issued his decision (the "1985 ALJ Decision"), wherein he ruled: (1) the parties to the 1973 Stipulation had not anticipated NGPA pricing and, therefore, neither NGPA nor pre-NGPA prices applied; (2) accordingly, there was a missing price term that needed to be supplied by establishing a "reasonable price" for the gas; (3) the "reasonable price" was to be based on a ratio of sharing the increased cost of NGPA pricing such that CIGE would be entitled to be paid at the NGPA rate for 40% of the gas and at a minimum level equivalent to an NGPA § 104 price for 60% of the gas; and (4) the 1973 Stipulation did not permit CIGE to receive

tight sands incentive prices because CIG's resale customers had not consented to the 1981 Amendments to the Gas Purchase Contracts authorizing such prices, although CIGE could receive the otherwise applicable NGPA § 103 price for tight sands under the 60–40% formula. Thus, the 1985 ALJ Decision made clear that CIG was not entitled to charge its resale customers tight sands prices.

On appeal, in FERC Opinion No. 306 issued July 7, 1988 ("Opinion 306"), FERC affirmed in part and reversed in part the 1985 ALJ Decision. In pertinent part, FERC ruled:

> a. contrary to the 1985 ALJ Decision, NGPA generally applied to gas sold under the 1973 Stipulation, thereby allowing NGPA incentive prices to replace "area rate" prices as the regulated price for gas under the gas search program;
>
> b. nevertheless, to qualify for the NGPA tight sands prices, the sale of gas subject to the gas search program has to be governed by a "negotiated contract price" in accordance with its regulations;
>
> c. because the "negotiated contract price" language included in the 1981 Amendments to the gas purchase contracts had not been agreed to by CIG's resale customers, FERC ruled that those prices did not constitute a "negotiated contract price."

Therefore, the lower regulated price under NGPA was the highest permitted[4] and CIG was ordered to refund to its customers the difference between those prices and the tight sands prices actually charged. Thus, like the 1985 ALJ Decision, FERC Opinion 306 made clear that CIG was not authorized to charge its customers tight sands prices. Following issuance of Opinion 306, all parties filed exceptions and requested rehearing. FERC denied rehearing on November 28, 1988. *Colorado Interstate Gas Co. et al.*, 45 FERC ¶ 61,293 (1988).

The parties then entered into a "Stipulation and Settlement Agreement" dated Feb-

---

**4.** CIGE points out that this price was the NGPA § 103 price. *See* 15 U.S.C.A. § 3317 (West 1982); 18 C.F.R. § 271.703 (1990).

ruary 23, 1989 (the "1989 Settlement"). FERC approved the 1989 Settlement with modifications on August 1, 1989. CIG, CIGE, and the City of Colorado Springs requested rehearing on FERC's modifications to the 1989 Settlement. These requests were denied on July 9, 1990. FERC's order approving the 1989 Settlement with modifications became final on August 8, 1990 when all parties accepted FERC's order without further exception or appeal.[5] Under the 1989 Settlement, CIG agreed to refund to its customers $89,000,000.00 in either four equal annual payments with interest calculated under 18 C.F.R. § 154.67(c) from the "date of this order under the settlement as modified by this order" or at any earlier time as elected by CIG and CIGE.

Defendants in this action are the owners of various overriding royalty interests in a natural gas field located in Uintah County, Utah, known as the Natural Buttes Federal Unit. In connection with the gas search program, CIGE acquired various working interests in the Natural Buttes Unit and assumed the duties of the unit operator. By letter dated July 2, 1991, CIGE notified the Defendants that its right to charge tight sands prices had been successfully challenged and demanded the reimbursement of what it contends were excessive royalty payments due to those royalty payments having been based on the tight sands prices it had received. The Conoco Defendants claim that prior to July 2, 1991, CIGE had never notified them of the Colorado state action filed in 1982 challenging its right to charge tight sands prices, the 1985 ALJ Decision declaring that CIGE could not charge such prices, FERC Opinion 306, or that CIGE had entered into the 1989 Settlement obligating it to refund the sum of $89,000,000.00. CIGE disagrees, claiming that Defendant Tenneco "was placed on notice of the FERC litigation in the summer of 1984, when Tenneco's General Counsel, Walter Sapp, who was CIG's General Counsel during the formation of the Gas Search Program[,]

was asked to testify on CIGE's behalf." CIGE Mem. Opp'n M. Summ. J. at 7–8.

On July 8, 1991, CIGE commenced this action to recover the alleged excess overriding royalty payments made to Defendants, and asserting as causes of action: declaratory judgment (mistake); restitution/unjust enrichment, monies had and received; overpayments made under business duress; federal common law reimbursement; and indemnification and contribution. The last royalty payments in dispute in this action were made to Defendants in March 1985. CIGE refunded the portion of the claim attributable to Natural Buttes tight sands pricing on September 17, 1991. The total amount refunded was approximately $62,000,000.00.

## II. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court must construe all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Wright v. Southwestern Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir.1991).

Once the moving party has carried its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Gonzales v. Millers Casualty Ins. Co.*, 923 F.2d 1417, 1419 (10th Cir.1991).[6] The nonmoving party must "make a showing sufficient to establish the existence of an element essential to that

---

5. The dispute regarding paragraph 24 of the Conoco Def.s' Mem.Supp. M. Summ. J. is merely a matter of detail and does not present an issue of material fact.

6. The summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex Corp,* 477 U.S. at 324, 106 S.Ct. at 2553.

party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. at 2552.

■ In considering whether there exist genuine issues of material fact, the court does not weigh the evidence but instead inquires whether a reasonable jury, faced with the evidence presented, could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Clifton v. Craig,* 924 F.2d 182, 183 (10th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 97, 116 L.Ed.2d 68 (1991).[7] Finally, all material facts asserted by the moving party shall be deemed admitted unless specifically controverted by the opposing party. D.Utah R. 202(b)(4).

## III. DISCUSSION

### A. CIGE's Claim for Relief for Contribution Under Utah Law

In Count VI of the Complaint, CIGE seeks contribution from Defendants for monies it reimbursed to its resale customers. The Conoco Defendants argue that CIGE's contribution claim must fail because "Defendants and CIGE did not have any common liability to CIG's resale customers. Consequently, the payment of monies by CIGE to CIG's resale customers did not discharge any obligation of Defendants to those customers." Conoco Def.s' Mem.Supp. M. Summ. J. at 15–16. CIGE disagrees, arguing that a common liability existed between CIGE and Defendants because CIGE was acting as Defendants' agent in marketing gas to CIG's resale customers. CIGE contends the agency relationship was created through Defendants' execution of division orders that "expressly authorized CIGE to market their gas...." CIGE's Mem.Opp'n M. Summ. J. at 11. Therefore, CIGE argues, Defendants are jointly liable for CIGE's overcharges to its resale customers.

■ Under Utah law, contribution is the means by which one person obtains reimbursement from another for a proportionate share of an obligation paid by that person.

*Gardner v. Bean,* 677 P.2d 1116, 1118 (Utah 1984). Thus, contribution · "'presumes the payment and extinguishment of the debt by one for the benefit of all.'" *Id.* (quoting *Dillenbeck v. Dygert,* 97 N.Y. 303, 309 (1884)). Absent a common liability, the extinguishment of the liability by one party would not benefit the other, and no claim for contribution would exist. *E.g., Phillips v. Union Pac. R.R. Co.,* 614 P.2d 153, 154 (Utah 1980).

■ CIGE's claim that the division orders signed by Defendants created an agency relationship misapprehends the nature of a division order and the nature of CIGE's relationship with Defendants. "In brief, a division order is simply a direction and an authorization to a person who has (or will have) a fund for distribution among persons entitled thereto as to the manner of distribution." 4 Howard R. Williams & Charles J. Meyers, *Oil and Gas Law* § 701, at 572 (1992) (hereinafter "Williams & Meyers"); *see also* Richard W. Hemingway, *Law of Oil and Gas* § 7.5, at 412 (3d ed. 1991) (hereinafter "Hemingway") ("Under the general view, a division order is a revocable authorization to the purchaser of production for payment upon a stated basis to the owners of production."). The basic purpose of a division order is to give the purchaser of oil or gas "specific directions as to the payment to be made to each party." 4 Williams & Meyers § 701, at 573.

Based on this standard, the division orders signed by Defendants did not create an agency relationship with CIGE. A royalty interest, such as that held by Defendants, "is a share of production, 'if, as and when there is production, free of expenses of production.'" *Flying Diamond Oil v. Newton Sheep Co.,* 776 P.2d 618, 629 (Utah 1989) (quoting 8 Williams & Meyers, at 862–63 (1987)). By signing the division orders, Defendants agreed to receive from the sale of the gas only that portion of the proceeds listed on the particular division order. It is the common practice in the oil and gas industry that a gas royalty clause requires the lessee

---

7. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position

will be insufficient." *Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2512.

(CIGE) to account to the lessor or royalty owner (Defendants) for the value of the gas produced. Hemingway § 7.5, at 415.

■ In an oil lease, title to the oil does not pass to the lessee, but is reserved in the lessor. "Where the oil is sold by the lessee, the lessee becomes the agent of the royalty owner, and must account for the money received in sale of the lessor's oil." Hemingway § 7.5, at 415.

■ Unlike oil, gas is a form of petroleum that is capable of infinite expansion. For this reason, an overriding royalty interest in gas is a nonpossessory interest. 2 Williams & Meyers § 418.1, at 347. Therefore, unlike an oil lease, in a gas lease "[t]itle to the gas passes to the lessee upon execution of the lease," Hemingway § 7.5, at 415, and the lessee has an absolute right to dispose of the entire production. *Greenshields v. Warren Petroleum Corp.*, 248 F.2d 61, 67 (10th Cir. 1957), *cert. denied*, 355 U.S. 907, 78 S.Ct. 334, 2 L.Ed.2d 262 (1957); *Anschutz Corp. v. Natural Gas Pipeline of Am.*, 632 F.Supp. 445, 452 (D.Utah 1986). Therefore, " '[t]he relationship between the lessee and the lessor is not one of principal and agent, but of debtor and creditor.' " *Id.* (quoting Hemingway § 7.5, at 365 (1983)). As stated by the Tenth Circuit:

> It is well settled that the provision concerning the payment for gas operates to divest the lessor of his right to obtain title in himself by reduction to possession and that thereafter his claim must be based upon the contract with the one to whom he has granted the right. His claim can only be for payment in money and not for the product itself.

*Greenshields*, 248 F.2d at 67. Consequently, the leases between CIGE and Defendants operated to transfer title in the gas from Defendants to CIGE. At that point, Defendants held merely a royalty interest in a certain portion of the gas proceeds, and the relationship between CIGE and Defendants remained that of lessor/lessee. With respect to Defendants' royalty interests, CIGE occupied the position of debtor, not agent.[8]

■ This conclusion is supported by general principles of agency law. An agent is " 'a person authorized by another to act on his behalf and under his control.' " *Vina v. Jefferson Ins. Co. of New York*, 761 P.2d 581, 585 (Utah Ct.App.1988) (quoting *Western Elec. Co. v. New Mexico Bureau of Revenue*, 90 N.M. 164, 167, 561 P.2d 26, 29 (1976)). Thus, a necessary precondition to the establishment of an agency relationship is that the principal have control over the conduct and activities of the agent. *E.g., Haworth v. Central Nat'l Bank of Oklahoma City*, 769 P.2d 740, 743 (Okla.1989). "An owner of a royalty interest, absent specific provision to the contrary, does not acquire the power to lease; does not have rights of ingress or egress for purposes of extracting minerals; and is not entitled to receive bonuses or delay rentals payable under an oil or gas lease. The owner of a royalty interest receives a perpetual interest (though a term of years may be granted), entitling him to the 'described fraction of oil and gas produced and saved, free of costs.' " *Resource Management Co. v. Weston Ranch*, 706 P.2d 1028, 1033 (Utah 1985). Thus, Defendants only interest in the gas was the right to receive a fraction of the proceeds of the gas extracted. Defendants had no authority to control or direct CIGE's exploration or distribution activities as title of the gas had passed to CIGE. It would be a peculiar construction of agency law for the court to conclude that CIGE was Defendants' agent where CIGE had unfettered title to the gas and full authority to dispose of that gas without Defendants' approval, subject only to paying Defendants their royalty interest.

■ The language of the division orders quoted by CIGE does not alter this conclusion. CIGE cites the following as the "critical language":

> Until further written notice you are authorized, for your own account, to receive such oil into your possession or the possession of any person or corporation designated by you.... In making settlements for the interest of the undersigned in the proceeds from the sale of gas, your are authorized to

---

8. CIGE has not claimed, and there is no evidence before the court, that an agency relationship arose from Defendants' ratification of CIGE's practice of charging the tight sands prices.

use the market value at the wells for the gas sold or used off the property or the net proceeds received by you at the wells when the gas is sold at the wells. You are authorized to make a fair and reasonable charge for gathering and making merchantable the undersigned's share in the gas sold off the property, said charge to be shown as a proper deduction from the gross amount to determine the market value at the well currently payable as royalty.

CIGE's Mem.Opp'n M. Summ. J. at 12. Through this language, Defendants "authorized" CIGE to use the "market value" for the gas, less "reasonable" production charges. This authorization, however, could not act to create an agency relationship where title to the gas already had passed to CIGE. This language merely obligates CIGE to account to Defendants for their shares of the proceeds of production. The language cited by CIGE in the division orders signed by Defendant Hanover Petroleum Company is to the same effect.[9]

■ Finally, the court rejects CIGE's argument that disputed issues of material fact prevent the court from ruling on this issue. The existence of an agency relationship is determined from all the facts and circumstances of the case. *Wilkerson v. Stevens,* 16 Utah 2d 424, 425, 403 P.2d 31, 32 (1965). The party asserting the existence of an agency relationship bears the burden of proving that relationship at trial. *Id.* CIGE has failed to point to any specific disputed facts that would prevent the court from reaching this issue; rather, this issue is before the court on a generally undisputed record. As previously mentioned, the few disputed paragraphs in Defendants' factual statement are matters of focus and detail and certainly do not regard material facts. For the foregoing reasons, the court holds that CIGE was not acting as Defendants' agent in the transactions at issue, and CIGE's claim for reimbursement fails.

## B. CIGE's Claim for Relief for Indemnification Under Utah Law

■ In addition to its claim for contribution, CIGE also has plead a claim for indemnification against Defendants. In support of its claim for indemnification CIGE cites an indemnification clause in the division orders.[10] For example, the division order executed by Defendant Hanover Petroleum Corporation states:

> Ninth: In consideration of the payment to you as above by CIGE, the undersigned hereby indemnifies and agrees to save CIGE harmless from and against any and all loss, cost, expense or damage it may suffer in [sic] incure [sic] on account of paying to you such proceeds.

CIGE's Mem.Opp'n M. Summ. J. at 15.

■ CIGE's reliance on this indemnification clause, however, challenges contrary Utah Supreme Court precedent. · Utah courts follow a rule of strict construction when addressing an indemnity agreement and the claim that through such an agreement one party has shifted financial responsibility for its own wrongdoing to another party. *E.g., Shell Oil Co. v. Brinkerhoff–Signal Drilling Co.,* 658 P.2d 1187, 1189 (Utah 1983); *Union Pac. R.R. v. Intermountain Farmers Ass'n,* 568 P.2d 724, 725–26 (Utah 1977); *Howe Rents Corp. v. Worthen,* 18 Utah 2d 263, 265, 420 P.2d 848, 849 (1966); *Union Pac. R.R. v: El Paso Natural Gas Co.,* 17 Utah 2d 255, 258–60, 408 P.2d 910, 913–14

9. Without ruling on the issue, the court notes that CIGE's argument is inconsistent with agency law in one other respect. It is axiomatic that acts performed by an agent beyond the scope of the agency do not bind the principal. *See Producers Livestock Loan Co. v. Miller,* 580 P.2d·603, 605–06 (Utah 1978). Even assuming that CIGE was acting as Defendants' agent, the division orders do not authorize CIGE ·to charge tight sands prices for the gas, and.it is that conduct that obligated CIGE to reimburse the resale customers. In fact, CIGE has presented no evidence that it ever sought Defendants' approval to charge the resale customers tight sands prices.

10. The following Defendants executed division orders containing indemnification clauses: Hanover Petroleum Corporation, Gilman A. Hill, Lori L. Hill, Kimberly J. Hill, Laura E. Lacy, David A. Hill, LaVon S. Hill, Craig S. Hill, Mt. Carmel Trust, Calhoun·Living Trust, Decalta International Corporation, Betty G. Garff, Raymond T. Duncan, Jack Warnock Estate, Robert J. Minton, John H. Morgan, Sr. Estate, John H.·Morgan Jr., · Utah Resources International, John R. Anderson, Carol Lee Hatch, and Ruth Lee.

**1542**

(1965). Under the strict construction rule, a party is contractually obligated to assume ultimate financial responsibility for the acts of another "only when that intention is clearly and unequivocally expressed." *Union Pac. R.R.*, 408 P.2d at 913. "But the presumption is against any such intention, and it is not achieved by inference or implication from general language...." *Id.* at 914. The United States Court of Appeals for the Tenth Circuit and this court have recognized and applied this rule. *E.g., Kennecott Copper Corp. v. General Motors Corp.*, 730 F.2d 1380, 1382 (10th Cir.1984) ("If the purpose is to insure against its own acts, that constitutes an indemnification agreement, and the presumption against it will prevail in the absence of a clearly expressed contrary intent."); *Freund v. Utah Power & Light Co.*, 625 F.Supp. 272, 280 (D.Utah 1985).[11]

Based on the strict construction rule, the court holds that as a matter of law the indemnification clauses in the division orders do not expressly provide that the parties intended to indemnify CIGE for its own wrongful conduct. Rather, the clause at issue contains the form of "general language" referred to by the Utah Supreme Court in *Union Pacific*, and therefore applies to CIGE's wrongful conduct "only when that intention is clearly and unequivocally expressed." 408 P.2d at 914. The language at issue in *Union Pacific* stated that the defendant in that case would indemnify and hold Union Pacific Railroad harmless: "from and against *any and all* liability loss, damages, claims, ... *of whatsoever nature*" arising

from specified activities. *Id.* at 912 (emphasis in original). The similarity to the language in the division orders is striking: "the undersigned hereby indemnifies and agrees to save CIGE harmless from and against *any and all* loss, cost, expense or damage" arising from the specified activity. Under any reading of the clause at issue, there is no "clear and unequivocal" expression that the parties intended to indemnify CIGE for its own wrongful conduct. Even reading the facts and inferences in the light most favorable to CIGE, Defendants are entitled to judgment as a matter of law on this issue.

*C. CIGE's Claim for Relief for Contribution Under Federal Common Law*

■■■■ In addition to its claims under Utah law, relying on *Exxon Corp. v. Jarvis Christian College*, 746 F.Supp. 652 (E.D.Tex. 1989), CIGE claims it has a right to contribution against Defendants under federal common law.[12] For the following reasons, the court agrees and holds that under federal common law CIGE has a right to equitable reimbursement from Defendants.

The decision of Chief Judge Parker of the United States District Court for the Eastern District of Texas in *Jarvis* was one of many decisions resulting from the Department of Energy's ("DOE") lawsuit against Exxon Corporation ("Exxon") regarding the Hawkins Field Unit ("HFU") near Tyler, Texas. In 1983, the United States District Court for the District of Columbia found that Exxon has violated the two-tier oil price regulations

---

**11.** The court recognizes that the Utah Court of Appeals has signaled a desire to limit application of the strict construction rule. In *Pickhover v. Smith's Management Corp.*, 771 P.2d 664, 670 (Utah Ct.App.1989), *cert. denied sub nom., Pickhover v. Young Elec.*, 795 P.2d 1138 (Utah 1990), the court declined to extend the strict construction rule to agreements to purchase insurance for another's benefit.

To the limited extent that *Pickhover* is relevant to the issues before the court, the court notes that it need not follow the opinions of inferior state courts, especially where the court relies instead on the opinions of the state's highest court.

**12.** CIGE also relies on FERC Opinion 306 as authority for its claim for contribution. That order states:

CIG, CIGE, or both, have the right to seek recovery of and retain third party excess payments and related costs from the recipients of those payments and are not required to pass those payments through to their customers. Def.s' Mem.Supp. M. Summ. J. Ex. H, ¶ 9, at 3. This statement, however, is immaterial for purposes of the motions before the court. CIGE has not shown that Defendants were parties to the FERC action, and the issues presented in this litigation were not before FERC. Moreover, Opinion 306 merely states that CIGE has the "right to seek recovery" from Defendants, but does not grant CIGE recovery against Defendants.

set forth in 10 C.F.R. § 212.73–.74 (1975) by selling crude oil in excess of the congressionally mandated price. *United States v. Exxon Corp.*, 561 F.Supp. 816, 816 (D.D.C.1983), *aff'd in part and sup'd in part*, 773 F.2d 1240 (T.E.C.A.1985), *cert. denied*, 474 U.S. 1105, 106 S.Ct. 892, 88 L.Ed.2d 926 (1986). Exxon thereupon paid in excess of two billion dollars to the United States Treasury "for overcharges and interest in the sale of HFU crude oil during the period from January 1, 1975, through January 28, 1981." *Jarvis*, 746 F.Supp. at 653. Having made such a payment, in the *Jarvis* litigation Exxon claimed it should be reimbursed for the amounts paid to the United States that were attributable to the share of unit production received by other HFU interest owners. *Id.* As one basis for relief Exxon claimed it had "an implied cause of action [for contribution] as a matter of federal common law," and the court agreed. *Id.* at 654.

In so holding, the court reasoned that "[t]he United States Supreme Court has recognized 'the need and authority in some limited areas to formulate what has come to be known as "federal common law." ' " *Id.* (quoting *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640, 101 S.Ct. 2061, 2067, 68 L.Ed.2d 500 (1981)). The court concluded it had authority to fashion federal common law "where a federal rule of decision is necessary to protect 'uniquely federal interests' and where Congress has given the courts the power to develop substantive law." *Id.* (citing *Texas Indus.*, 451 U.S. at 640–42,

101 S.Ct. at 2067–68). Based on this authority, the court determined that on the facts before it a right of contribution existed under federal common law based on two considerations: (1) because reimbursement in the case at bar implicated federal petroleum price controls, a "uniquely federal interest"; and (2) "a sense of justice and fairness demands that Exxon be allowed to maintain a cause of action for reimbursement." *Id.* at 654–55.[13]

The cause of action recognized in *Jarvis* has taken root in this circuit. Following *Jarvis*, Judge Theis of the United States District Court for the District of Kansas defined what he termed a federal common law right of equitable reimbursement in *In re Dept. of Energy Stripper Well Exemption Lit.*, 743 F.Supp. 1476 (D.Kan.1990) ("*Stripper Well*"). In that case, Mobil Oil Corporation, the operator of an oil-producing property, brought an action against the Department of Energy ("DOE") challenging DOE's Ruling 1974–29, which addressed allowable prices for oil produced from "stripper" wells. The court granted Mobil's motion for an injunction prohibiting the DOE from enforcing its ruling, but required Mobil to deposit with the court

> the difference between the price received for crude oil pursuant to any and all certifications of a property as a stripper well property and the price for which such crude oil would have been sold had the same been sold pursuant to a certification of the property as a non-stripper property.

---

13. Chief Judge Parker's order is part of an ongoing morass of litigation in several courts. While Judge Parker recognized a cause of action for reimbursement under federal law, initially he expressed doubt about Exxon's ability to recover as against possible affirmative defenses. In response to an oral motion, however, Judge Parker ordered that the trial of damages should precede the trial of the liability issue. *See Exxon Corp. v. Jarvis Christian College*, No. 5–132, 1991 WL 259271, at *2 (Temp.Emer.Ct.App; Sept. 26, 1991). In response to several motions, on February 15, 1991 Judge Parker reiterated his earlier ruling "that Exxon had an implied cause of action for reimbursement against Defendants as a matter of federal common law." *Id.* Judge Parker rejected the Defendants' argument that Exxon was not entitled to damages because it was a "wrongdoer" in the sense that Exxon was responsible for causing the overcharges. *Id.* Finally, Judge Parker ruled that the measure of

damages would be "the difference between the amount of royalties actually received and the amount that would have been received had the ... oil been properly classified." *Id.*

Faced with this ruling, the Defendants asked the United States Temporary Emergency Court of Appeals to intervene, arguing that Judge Parker's conclusions constituted "serious errors ... which warrant correction through a writ of mandamus." *Id.* at *3. The court rejected this claim, holding that "we express no opinion concerning the ultimate validity of the court's grant of summary judgment, but reject the argument that any possible deficiencies in procedure or substance warrant issuance of the writ." *Id.* at *5.

Whether the working interest and royalty interest owners are liable to Exxon for any overcharges remains to be determined. The court is unaware of any final resolution of this matter.

*Id.* at 1479. After protracted litigation, the court eventually entered judgment against Mobil in an amount in excess of $10,000,000.

Mobil thereupon filed a third party complaint against, among others, Sun Company, Inc., to recover portions of the judgment recovered by the DOE. Mobil alleged that Sun was a working interest owner and purchaser of crude oil from Mobil-operated properties located in Oklahoma, that Sun assumed responsibility for severance tax payments on the incremental value of stripper well oil that Sun purchased from those Mobil-operated properties, and that Sun withheld or failed to timely deposit into an escrow account sums attributable to the incremental value of the stripper oil wells, including funds paid to the State of Oklahoma as severance taxes. Based on these allegations, Mobil claimed that $777,105 of the $10,000,-000 judgment in favor of DOE "was attributable to Sun for interest on delayed payments of severance tax amounts into the escrow and interest on delayed payments of principal (i.e., the stripper price increment) into the escrow." *Id.* at 1478.

As one argument in support of this claim, Mobil asserted "that Sun is liable under federal common law of contribution, indemnity, or restitution." *Id.* at 1482. While Judge Theis did not believe the particular facts of the case warranted extension of liability to Sun, he provided a cogent and powerful analysis of the rationales behind allowing a unit operator to recover for overcharges received by nonoperating parties. Judge Theis reasoned that Congressionally mandated pricing structures, such as the Economic Stabilization Act and the Emergency Petroleum Allocation Act, are designed to combat inflation and encourage domestic production of petroleum products. If nonoperating interest owners were allowed to receive and retain overcharges, Congress' goals in enacting the legislation would be defeated. *Id.* at 1483. "For these reasons as well as a sense of justice and fairness, the [*Jarvis*] court held that [the unit operator] had an implied cause of action under federal common law for reimbursement." *Id.*

Having noted the existence of a federal common law right to reimbursement, Judge Theis analyzed the relationship among the parties to determine whether that cause of action should apply to the facts before the court. The cause of action recognized in *Jarvis* involves the liability of interest owners, whereas "Mobil [was] seeking to hold Sun liable for all of the deficiencies because Sun as the first purchaser of the crude oil made the severance tax payments to the State of Oklahoma." *Id.* at 1483. Therefore, Judge Theis reasoned, Mobil was seeking not to extend liability under federal common law to an interest owner, as in *Jarvis*, but to the first purchaser of the oil. Judge Theis concluded:

> The court does not believe liability should be extended to the first purchaser in this instance. Holding an interest owner liable for its share of the overcharges is fair because the owner received its share of the overcharges. As between the operator of the property and the first purchaser, neither of whom received or retained all the overcharges, it is fairer to impose liability on the operator who has a potential cause of action against the working interest and royalty interest owners.

*Id.* Under this analysis, then, the liability of a party rests on whether that party "received or retained the overcharges."

Relying on Chief Judge Parker's and Judge Theis' well-reasoned opinions in *Jarvis* and *Stripper Well,* this court concludes that principles of equity and fairness demand that CIGE have a federal cause of action against Defendants for those portions of royalty payments that resulted from overcharges which CIGE has refunded to its customers. The court holds that as a matter of law Defendants are liable to CIGE for the difference between the amount of royalties actually received and the amount that would have been received had the gas been properly classified.[14] This conclusion is based on the following considerations.

By enacting the NGPA's comprehensive pricing structure the Congress created a

---

14. This conclusion is tempered by the court's subsequent finding that CIGE's federal equitable reimbursement claim is time barred.

"uniquely federal interest" requiring the protection of a federal rule of decision. *Cf. Texas Indus. Inc.*, 451 U.S. at 640–42, 101 S.Ct. at 2067–68. With the NGPA, Congress intended to encourage production and exploration of natural gas sources and to guarantee adequate supplies of natural gas in the national market. *See* H.R.Rep. No. 436, 95th Cong., 2d Sess. 10 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7855, 7858–59; H.R.Rep. No. 496 Part IV, 95th Cong., 2d Sess. 96–97 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7659, 8540–41. The NGPA allowed for higher prices for tight sands gas as an incentive to increased domestic production of natural gas. Thus, FERC has made clear that tight sands prices are proper only where they serve as an incentive for the production of new tight formation gas, and *should not result in a windfall to the sellers.* FERC Statute and Regulations (Regulation Preambles 1977–81), 30, 183 at 31,271 (1980). In fact, to ensure that tight sands prices did not result in a windfall to the sellers, producers could charge tight sands incentive prices only if there existed a "negotiated contract price" with the customer authorizing the higher prices. 18 C.F.R. § 271.703 (1990). Allowing the Conoco and Enron Defendants to receive and retain the overcharges undermines these goals by allowing them to receive the tight sands prices where those prices did not result from a negotiated contract price.

Moreover, this is a court of equity. Justice and fairness demand that CIGE be allowed to maintain a cause of action for equitable reimbursement. FERC's approval of the 1989 Settlement reached into the past to correct the present by putting the parties in the positions they would have been had CIGE charged the correct prices for the new gas. There is no reason why that correction should not continue up the line and extend to those with royalty interests in the gas. Any other result would unfairly enrich the royalty owners at CIGE's expense.

### D. Are CIGE's Remaining State–Law Claims Time–Barred under the Applicable Statutes of Limitations?

Defendants have moved for summary judgment on CIGE's claims for mistake, restitu-

tion/unjust enrichment, monies had and received, and overpayment. Defendants argue the Utah limitations period applicable to these claims "is the period of limitations applicable to equitable claims to recover monies from another, whether it is denoted as a claim for recoupment, restitution, monies had and received, overpayment or mistake." Conoco Def.s' Mem. Supp. M. Summ. J. at 28. This period, Defendants argue, is the four-year limitations period found in Utah Code Ann. § 78–12–25(1) (1992). Moreover, Defendants argue the statute began to run in March, 1985, when the last overriding royalty payment in dispute was received by Defendants. As CIGE did not commence this lawsuit until July 8, 1991, more than six years later, this action, Defendants argue, is barred by § 78–12–25(1).

CIGE disagrees, arguing that its claims did not accrue until it had discovered the overpayment and made demand for restitution. Relying on *Merkley v. Beaslin*, 778 P.2d 16 (Utah Ct.App.1989), CIGE also argues that its claims did not accrue upon the occurrence of the event giving rise to liability, but rather accrued upon discovery of the claim. Alternatively, CIGE argues the correct limitations statute is Utah Code Ann. § 78–12–26 (1992), and therefore its claims did not accrue "until the discovery by the aggrieved party of the facts constituting the fraud or mistake." *Id.* Finally, CIGE argues that if its claims are time barred, the court should apply the doctrine of equitable tolling to defeat Defendant's motion.

It is undisputed that in 1982 the Public Service Company of Colorado and other resale customers brought suit against CIG and CIGE alleging that CIG and CIGE had breached the 1973 Stipulation by charging tight sands prices without their consent. It also is undisputed that from 1982 to August 8, 1990, CIG and CIGE were involved in a succession of administrative law decisions, FERC hearings, and settlement agreements regarding the practice of charging tight sands prices. Finally, CIGE has not disputed the Conoco Defendants' claim that "[t]he last royalty payment in dispute in this action

were made to Defendants during March 1985." Conoco Def.s' Mem.Supp. M. Summ. J. at 13.

█ Utah law requires that "[c]ivil actions be commenced only within the periods prescribed in this chapter, after the cause of action shall have accrued, except where in special cases a different limitation is prescribed by statute." Utah Code Ann. § 78–12–1 (1992). Under section 78–12–25(1), "[a]n action upon a contract, obligation, or liability not founded upon an instrument in writing" must be brought "within four years after the last charge is made or the last payment is received." Given the undisputed facts outlined above, if this section applies to CIGE's claims, CIGE must have filed those claims within four years of March 1985, the date CIGE made the last royalty payment to any Defendant. As CIGE filed this action on July 8, 1991, if section 78–12–25(1) applies to CIGE's claims then section 78–12–1 would operate to bar those claims.

█ The essence of CIGE's claims for mistake, restitution/unjust enrichment, monies had and received, and overpayment is that CIGE mistakenly paid excess royalties to Defendants due to its having mistakenly charged tight sands prices. As opposed to CIGE's claim for indemnification, these claims are not based on any express contract or other written instrument obligating Defendants to reimburse the claimed overpayments. Rather, CIGE's claims at issue arise from equitable theories of implied and quasi-contract. For example, a party recovers money paid by mistake under the rule that "money paid through misapprehension of facts belongs, in equity and good conscience, to the person who paid it." 66 Am.Jur.2d *Restitution and Implied Contracts* § 120, at 1055 (1973); *see also Guardian State Bank v. Stangl*, 778 P.2d 1, 4–5 (Utah 1989) ("Refor-

mation of an instrument for mutual mistake is an equitable remedy that has long been recognized.").[15] Likewise, "[a] right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another." 66 Am.Jur.2d *Restitution and Implied Contracts* § 3, at 946 (1973). Further, a claim for monies had and received is based on the theory that one has money in hand belonging to another which, in equity and with good conscience, should be paid over. *See, e.g., Municipality of Anchorage v. Sisters of Providence in Washington, Inc.,* 628 P.2d 22, 34 (Alaska 1981); *Burlington Northern, Inc. v. Lester,* 48 Or.App. 579, 585, 617 P.2d 906, 910 (1980); *Heaton v. Imus,* 93 Wash.2d 249, 250, 608 P.2d 631, 632 (1980). Finally, by its own terms, CIGE's action for overpayment rests on the theory that "Defendants should in equity be required to refund to [CIGE] the overpayments of royalties, together with prejudgment and postjudgment interest." Compl. ¶ 117, at 24. Thus, CIGE's claims do not arise from a written instrument, but from equitable theories of unjust enrichment or implied assumpsit. Therefore, section 78–12–25(1) applies to these claims.

The Supreme Court of Utah reached a similar conclusion in *Petty & Riddle, Inc. v. Lunt,* 104 Utah 130, 138 P.2d 648 (1942). In that case the court held that where an action is brought to recover an excessive amount paid that is not based on a written promise to return the overpayment that action is based on an "implied contract" and is governed by the statue of limitations concerning actions not founded on a written instrument. *Id.* 138 P.2d at 650. While *Petty* dealt with a predecessor statute, the pertinent language of the two statutes is identical.[16]

---

**15.** The court declines to step into the fray over whether CIGE's mistake claim is one of unilateral or mutual mistake, or whether it is based on a mistake of fact or law. These questions are irrelevant to the motions before the court and serve only to obscure the real issue: CIGE's mistake claim arises from equitable theories, not a written instrument.

**16.** R.S. 104–2–23 (1933) provided:

> An action upon a contract, obligation or liability not founded upon an instrument in writing; also on an open account for goods, wares and merchandise, and for any article charged in a store account; also on an open account for work, labor or services rendered, or materials furnished; provided that an action in all the foregoing cases may be commenced at any time within four years after the last charge is made or the last payment received.

CIGE claims the *Petty* court held that the "four-year statute accrued when the plaintiff 'discovered that there was an overpayment and demand for restitution had been made.'" CIGE's Mem. Opp'n M. Summ. J. at 18–19 (quoting *Petty,* 138 P.2d at 652). This statement is incorrect and follows only from a casual reading of that case. The *Petty* court did not transform the four-year statute into a "discovery" statute. The issue before the court in *Petty* was which statute of limitations governed the case, the statute applicable to claims founded on a written instrument (six years), or the statute applicable to claims not founded on an obligation in writing (four years). As it was undisputed that the plaintiff both had made the overpayment and discovered the overpayment more than four years before bringing the action, the court's holding that the four-year statute governed the case obviated the need to address when the plaintiff's causes of action accrued. Thus, the court's statement that the four-year statute accrued when the plaintiff "discovered that there was an overpayment and demand for restitution had been made" is, at best, dicta. In fact, given section 78–12–25's clear statement that the cause of action accrues when "the last charge is made or the last payment is received," it would be error for the court to eschew the statute in favor of the *Petty* dicta.

Recent Utah case law has affirmed the rule that quasi-contractual claims concern a promise "implied in law" and therefore fall within section 78–12–25(1), and that the statute begins to run when the claimed overpayment is made. For example, in *Davidson Lumber v. Bonneville Inv., Inc.,* 794 P.2d 11 (Utah 1990), after settling a suit against it for sale of a defective product, Davidson Lumber Sales, Inc. ("Davidson") filed suit against the product's manufacturer to recover the damages the seller had paid to settle the first suit. Davidson alleged claims for negligence, breach of implied warranties, indemnity and contribution. On interlocutory appeal from the trial court's denial of the manufacturer's

motion for summary judgment based on the applicable statutes of limitations, the Utah Supreme Court held that common law causes of action based on theories of quasi-contract are governed by section 78–12–25(1):

> A common-law indemnity action is based on a theory of quasi-contract or contract implied in law and is generally held to be governed by the statute of limitations applicable to actions on implied contracts.... It is generally held that a contract statute of limitations, and specifically the statute that governs implied-in-fact contracts, applies to an action for common-law indemnity.

*Id.* at 19. Therefore, the court held, Davidson's negligence, warranty, contribution, and indemnification actions were governed by section 78–12–25 and its four-year limitations period. That period, the court noted, "commenced to run when Davidson paid the settlement obligation." *Id.*

CIGE's arguments to the contrary are not persuasive. The cases cited by CIGE do not support the proposition that equitable claims accrue when demand for repayment is made. As the court already has noted, this claim ignores the statute's plain dictate that the action must be commenced "within four years after the last charge is made or the last payment is received." Utah Code Ann. § 78–12–25(1) (1992).[17] Moreover, CIGE's reliance on *Merkley v. Beaslin,* 778 P.2d 16 (Utah Ct.App.1989), is misplaced. In *Merkley,* the Utah Court of Appeals held that a cause of action for legal malpractice accrues under section 78–12–25(1) "when the act complained of is discovered, or, in the exercise of reasonable care, should have been discovered." *Id.* at 19. The *Merkley* court's act in grafting a discovery rule onto section 78–12–25(1) was based, in part, on its belief that "[t]he nature of the attorney-client relationship is such that, often, attorney negligence would not be discovered until years after the act had occurred...." 778 P.2d at 19. CIGE has made no showing that such is the case regarding gas royalty payments; in fact,

17. Even CIGE admits in its memorandum that "the Utah Supreme Court had specifically determined that the four-year statute of limitations for common law indemnity and contribution only starts running when the underlying payment for which contribution or indemnity is sought is made." CIGE's Mem.Opp'n M. Summ. J. at 20. As previously mentioned, CIGE does not dispute that it made the last royalty payment in March 1985.

such a conclusion would be contrary to the facts of this case, where it is undisputed that CIGE was on notice as early as 1982 that charging the tight sands prices may have been in error.[18]

In sum, the court holds that CIGE's claims for mistake, restitution/unjust enrichment, monies had and received, and overpayment are governed by section 78–12–25(1)'s four-year statute of limitations. Further, the court holds that statute began to run at the latest in March 1985 when CIGE made the last royalty payment to Defendants. Therefore, because CIGE did not file this action until July 8, 1991, more than four years after the last royalty payment, CIGE's claims are barred by the statute of limitations.

### E. The Statute of Limitations and CIGE's Federal Claim for Equitable Reimbursement

■ The court also holds that CIGE failed to file its federal claim for equitable reimbursement within the applicable limitations period. The period of limitations governing that claim is the period of limitations that a Utah court would apply to a like cause of action. *Pipkin v. United States Postal Serv.*, 951 F.2d 272, 274 (10th Cir.1991). CIGE's federal equitable reimbursement claim arises from principles of equity and fairness, and therefore is governed by the Utah limitations statute concerning quasi-contractual, equitable claims not founded on a writing. Therefore, the court's reasoning regarding CIGE's mistake, restitution/unjust enrichment, monies had and received, and overpayment claims applies to CIGE's federal equitable reimbursement claim. Based on that reasoning, CIGE failed to bring its equitable reimbursement claim within the limitations period provided for in section 78–12–25(1), and consequently that claim is barred.

### F. Equitable Tolling Doctrine

■ ■ In an effort to avoid section 78–12–25(1), CIGE argues the court should apply the doctrine of equitable tolling to conclude the statute was tolled by the pendency of the FERC administrative proceedings. Courts apply the doctrine of equitable tolling in *narrow* situations where it would be unfair to enforce the limitations period against a plaintiff. *E.g., Irwin v. Veterans Admin.*, 498 U.S. 89, 96, 111 S.Ct. 453, 458, 112 L.Ed.2d 435 (1990) (doctrine of equitable tolling does not extend to a "garden variety claim of excusable neglect.").

On the undisputed record before the court, CIGE has no claim that principles of equity should shield it from section 78–12–25(1)'s reach. The lawsuit filed in 1982 by several of CIG's resale customers put CIGE on notice that there existed some question regarding the legality of the tight sands prices. Nevertheless, CIGE continued to make royalty payments based on the tight sands prices to Defendants until March 1985. On July 24, 1985, the administrative law judge ruled that the 1973 Stipulation did not permit CIGE to receive tight sands prices because CIG's resale customers had not consented to those prices. That decision was affirmed in part and reversed in part on July 7, 1988 by FERC Opinion 306, wherein FERC confirmed that CIG did not have authority to charge the tight sands prices. Following the issuance of Opinion 306, the parties entered into the 1989 Settlement, wherein CIG agreed to refund to its customers $89,000,-000.00. FERC approved the 1989 Settlement with modifications on August 1, 1989, and that order became final on August 8, 1990.

Viewing these facts in the light most favorable to CIGE, FERC ordered CIG to refund the tight sands overcharges to its customers on July 7, 1988, well within the four-year limitations period which expired in March 1989. CIGE was on notice as early as 1982 of the challenge to the charging of the tight sands prices, yet declined to file this action until 1991. Given the ongoing litigation between CIG and its resale customers, there is no basis upon which to support the conclusion that CIGE should be allowed to file this

---

**18.** Thus, this court's concern with the rule announced in *Merkley* is not present here. *See Brunetti v. The Regency Affiliates*, 152 B.R. 320, 323 (D.Utah 1993) ("the court is troubled by a rule that, in certain circumstances, would allow the statute of limitations to run before a cause of action has accrued and become remedial in the courts").

action beyond the limitations period. CIGE's argument that it could not have sued Defendants prior to FERC's approval of the 1989 Settlement is wrong. The 1989 Settlement was an agreement between private parties and certainly did not create Defendants' liability to CIGE. Had CIGE brought suit at that time, and had Defendants filed a motion to dismiss for failure to state a claim upon which relief can be granted, Defendants' liability to CIGE would have been determined at that time. While the court certainly is sympathetic to CIGE's plight, at the latest CIGE should have brought suit against Defendants in July 1988 when FERC issued Opinion 306.

## IV. ORDER

For the foregoing reasons, and good cause appearing,

IT IS HEREBY ORDERED as follows:

1. Defendants' Motion for Summary Judgment on CIGE's claim for contribution and indemnity under Utah law (Count VI) is granted, and those claims are dismissed with prejudice;

2. Defendants' Motion for Summary Judgment based on the statute of limitations is granted, and CIGE's claims for declaratory judgment/mistake (Count I), restitution/unjust enrichment (Count II), monies had and received (Count III), overpayment (Count IV), and federal equitable reimbursement (Count V) are dismissed with prejudice;

3. It appearing to the court that this Order disposes of all of CIGE's claims, counsel for Defendants are directed to prepare a final judgment.